*In re* WALSH'S ESTATE.

WALSH *v.* KEITH.

1. JURY—DRAWING JURY—PEREMPTORY CHALLENGES.

Where an action to contest the probate of a will is brought by several contestants, who file the same objections and appear by the same counsel in the probate court and sign the same claim of appeal, and one bond is filed for all the contestants, there is no error in refusing separate peremptory challenges.

2. WILLS—DUPLICATE WILLS—REVOCATION—PRESUMPTIONS.

Where a will is executed in duplicate the destruction by the testator of one part raises a rebuttable presumption that he intended thereby to revoke the will.

3. SAME—REVOCATION—DUPLICATE WILLS—EVIDENCE—QUESTIONS FOR JURY.

The evidence of revocation of a will was sufficient to be submitted to the jury, in an action to contest the probate thereof, where it was executed in duplicate and one part left in the testator's possession at the time of its execution could not after his death be found, although due search was made therefor.

4. TRIAL—WILLS—WITNESSES—APPEAL AND ERROR—PREJUDICIAL ERROR.

The failure in a probate contest in the circuit court, to call as a witness one of the witnesses to the will who testified in the probate court, but who was out of the State at the time of the trial in the circuit court, and whose testimony in the probate court was offered on such trial by the proponents and, on objection by contestants, was withdrawn, was not reversible error, there being no issue as to the execution of the will.

5. WITNESSES—CREDIBILITY—ADMISSIBILITY—WILLS — UNDUE INFLUENCE—FRAUD—EVIDENCE.

In an action to contest the probate of a will on the ground, in part, of undue influence and fraud practiced by some of the proponents of the will, testimony as to conduct and statements of one of the proponents at the home

of the father of the contestants, a brother of the testator, shortly before the death of such brother and the execution of the will, was admissible only for the purpose of testing the credibility of such proponent and not to prove undue influence.

6. EVIDENCE—MENTAL INCOMPETENCY—REMOTENESS.

In an action to contest a will on the ground, in part, of mental incompetency, letters written by the testator twenty-five years before he executed the will and which were the basis for a decree of divorce in the wife's favor many years before such execution, are properly excluded as too remote.

7. SAME—MENTAL INCOMPETENCY—ADMISSIBILITY.

In a will contest, in which one of the issues is the mental incompetency of the testator, the opinion in a divorce case in which a decree was entered in favor of testator's wife on the ground of extreme cruelty is inadmissible, it not being an adjudication of a question involved in the case.

8. SAME—MENTAL INCOMPETENCY—OPINIONS—ADMISSIBILITY.

A witness' opinion of the testator's mental capacity to transact business or as to the testator's mental and physical condition to transact business requiring an exercise of judgment and the reasoning faculties and consecutive thought, was admissible in a will contest.

9. SAME—EXPERT TESTIMONY—MENTAL INCOMPETENCY—APPEAL AND ERROR—PREJUDICIAL ERROR.

The sustaining of objections to questions asked an expert witness, as to the sufficiency of memory and understanding of a person suffering from *senile dementia* to make a discriminatory will, in an action to contest a will on the ground of mental incompetency of the testator, was not reversible error, in view of the extended examination of the witnesses permitted.

10. WILLS—REVOCATION—PRESUMPTIONS.

A charge, in a contest of a will executed in duplicate, that destruction by the testator of one part of such will before delivery of the other part to a certain party would not raise a conclusive presumption of an intent to revoke the will, and that such destruction at any time of one part with intent to revoke the will would constitute a revocation thereof, was not erroneous.

Error to St. Clair; Law, J. Submitted June 20, 1916. (Docket No. 22.) Decided May 31, 1917. Rehearing denied September 28, 1917.

Joseph Walsh and Nan Walsh presented for probate the last will and testament of Robert Walsh, deceased. From an order admitting the will to probate Emma Keith and others appealed to the circuit court. Judgment for proponents. Contestants bring error. Affirmed.

*Sloman & Sloman* (*Adolph Sloman*, of counsel), for appellants Emma Keith, Ellen G. Kennedy and others.

*Selling & Brand*, for appellants Flattery.

*Lincoln Avery* and *P. H. Phillips* (*Walsh & Walsh*, of counsel), for appellees.

STONE, J. This case presents a contest over a petition to probate the alleged last will and testament of Robert Walsh, deceased. The petition was granted in the probate court of St. Clair county, and contestants appealed to the circuit court, where the matter was tried before a jury, which found said instrument to be the last will and testament of said deceased. The case is brought into this court by the contestants. The instrument in controversy was made by Mr. Walsh on the 22d day of May, 1908, and was as follows:

"Last Will and Testament of Robert Walsh.
"In the name of God—amen.
"I, Robert Walsh, of Port Huron, Michigan, do make and publish this as my last will and testament.
"*First.* I give, grant and bequeath all my property, real, personal and mixed to Joseph F. Walsh and Nan Walsh, my executors herein named in trust for the uses, persons and purposes hereinafter named to be by them disposed of as I shall herein direct.
"*Second.* I give and bequeath to each of my nephews and nieces the sum of one thousand dollars—such nephews and nieces being as follows:

"William Flattery, Thomas Flattery, Robert Flattery, Emma Flattery Keith, Belle Flattery Keith, children of my sister, Johanna Flattery.

"Grace Flemming, Nellie Flemming, Thomas Flemming, children of my niece, Grace Flattery Flemming.

"Ellen Grace Kennedy, Maria Adeline Walsh, Aloysiaus Geneveve Walsh, Robert Walsh, Thomas Walsh, Charles R. Walsh, children of my brother, Patrick J. Walsh.

"*Third.* I give, grant and bequeath to the children of William Walsh, the deceased son of my brother Patrick J. Walsh, each the sum of five hundred dollars. * * * And I direct that my executors shall ascertain their names and pay that sum to each of them as hereinafter directed (as to time) in reference to other bequests.

"*Fourth.* In the case of the death of any person named or intended to be named in this will, I direct that the fund herein provided for such person shall be paid to his or her heirs, in the proportion that his or her estate would have been distributed had such person died intestate.

"*Fifth.* The rest and residue of my estate I give, grant and bequeath to the children of my brother, Thomas Walsh, as follows:

"Joseph F. Walsh, Mary Walsh Hayden, Helena Walsh, Elizabeth Walsh, Grace Walsh, Thomas A. Walsh, William Walsh, Regina Walsh, Nan Walsh or Anna Walsh, children of Thomas Walsh, nine in number.

"*Sixth.* I direct that my executors shall pay all legacies under this will before distributing my estate as provided in the sixth paragraph. * * * Such payment to be made out of the personal estate (if possible) and to be made within one year after my death if practicable and otherwise as soon as practicable thereafter without sacrifice of the estate. But if the payment of legacies be delayed after one year all such legacies shall draw interest at five per cent. payable annually and shall not be delayed longer than ten years.

"*Seventh.* In case the residuary legatees named in the sixth paragraph of this will, shall not all have attained the age of thirty-five years at my death (such

residuary legatees being children of my brother, Thomas Walsh), I direct that my executors defer the distribution of my estate until the youngest of such group shall attain that age and during that time (the time intervening after my death) that they manage my estate and collect the rents and income therefrom the same as I have been doing, making repairs and paying taxes, insurance, etc., as I have been doing, and investing the same for the benefit of said estate and said residuary legatees; unless my said executors shall decide that an earlier distribution is for the best interest of estate and legatees; and then I direct that such distribution shall take place.

"I hereby give and bequeath to my niece, Emma Keith, daughter of sister Johanna, of the city of Detroit, fifteen (15) shares of the St. Clair County Savings Bank stock for her use and benefit during her lifetime. At the death of my niece, Emma Keith, the use of said stock to be equally divided among her three nieces and one nephew during their lifetime, and should any of them die, the survivors to take the share of the said deceased.

"I hereby nominate Capt. Joseph F. Walsh and his sister, Nan Walsh, as executors of this will and testament.

"Witness my hand and seal this 22d day of May, A. D. 1908.

"ROBERT WALSH.    [Seal.]

"Be it remembered that on this 22d day of May, A. D. 1908, came the above-named testator, and subscribed the above will and testament in our presence and we, at his request and in his presence, subscribed our names hereto as witnesses.

[Signed]    "JOHN L. BLACK,
             "JEAN DOWN."

This alleged will was contested in the court below upon three grounds:

(1) Mental incompetency of the testator.

(2) Undue influence and fraud practiced by some of the proponents.

(3) The revocation of the will by testator by destroying the same.

When the will in question was made, Mr. Walsh

went to the office of Mr. John L. Black, an attorney in the city of Port Huron, where it was prepared. Previous wills had been made by the testator, and it is uncontradicted that all of such wills and one codicil were made in duplicate. On May 22, 1908, the testator went to Mr. Black's office. He had with him a will that Mr. Black had previously drawn in the year 1906 or 1907. In 1905, Mr. Black had prepared for the testator a codicil to the previous will drafted by O'Brien J. Atkinson and executed by testator on January 31, 1899. It is uncontradicted that all three of the wills above referred to were the same in their general trend and purpose. Slight changes were made in each successive will, or codicil, to meet certain changed conditions, which we do not deem it necessary to here detail.

The first will prepared by Mr. Atkinson was witnessed by Mr. Atkinson and George G. Moore, who at that time was in the office of Mr. Atkinson. As the record shows, this and all the subsequent wills left the great bulk of the estate to what may be termed the members of the Walsh family at Port Huron, children of the testator's brother Thomas Walsh, deceased. The contestants are the children of the testator's deceased brother Patrick J. Walsh, and also children of his sister Johanna Flattery, and children of the niece Grace Flattery Flemming. There is no question that, from a period prior to the making of the first will, until the death of the testator, his relations had been very close to, and his interest very great in, the family and children of his deceased brother Thomas Walsh, who are termed frequently in this record the Port Huron Walshes. It appears that when the first will was made he expressed great interest in this branch of the family, and the evidence shows that they were much in his mind. A comparison of the will here in controversy with the one drafted by Mr. Atkinson in

1899 shows that they are alike in language and disposition, and the evidence shows that the testator was desirous of using the same language in his subsequent wills, in the main, as had been used in the original will. The changes made were the provisions for Mr. Trimby being in paragraph 4 of the will prepared by Mr. Atkinson, which was dropped in the final will; the codicil to the Atkinson will prepared in 1905 by Mr. Black providing that the dividends on some bank stock be paid to Emma Keith and three nieces and one nephew. This became a part of and was embodied in the final will; and a nephew, Thomas Walsh, who had been named as executor in connection with Joseph Walsh, was dropped as an executor, and his niece Nan Walsh was named in his place. In other words, it may be said that Robert Walsh, in 1908, made the same provisions for the children of his brothers Patrick and Thomas that he had made in January, 1899, and the will prepared by Mr. Black in 1906 or 1907 did not in any way alter or change the provisions made for these two families as contained in the will of 1899. The testator stated his reasons explicitly in his instructions to his attorney for his desire to make the changes which were made. The history of this matter was given by Mr. Black upon the trial, and in speaking of the testator he testified, among other things, as follows:

"In 1905, he came to me and wanted a codicil made with relation to the 15 shares of stock of the St. Clair County Savings Bank. At that time I drafted that codicil in duplicate, and both duplicates were executed in the same manner. That was Mr. Robert Walsh's idea. He said that Mr. Atkinson advised him to do it. I asked him why he wanted it in duplicate, and he said Mr. Atkinson advised him to do so. The Atkinson will had been drawn in the same manner in duplicate too. And both of them executed as originals. And he brought both of them with him that day, and I annexed thereto the codicil in each instance. The

codicil was pasted onto the Atkinson will in the case
of each of the two of them, as I remember. The other
one, the other original codicil, was pasted on the
other original Atkinson will. That was in 1905. All
he wanted done at that time was a disposition of the
15 shares of stock of the St. Clair County Bank to go
to Emma Keith; that is what he told me. That was
the only matter of discussion with me at that time in
relation to drawing the will, and also that he wanted
it in duplicate. I did just as he wanted in that re-
gard. * * * Just as I remember it, it seems Mrs.
Keith had taken care of some children, and he wanted
her to get that much more, not absolutely, but the life
use of it. Then it was to go to those children, naming
them in there, whoever it was, I have just forgotten
the reading of it, not absolutely, but the life use of
it, if I remember rightly.

"He came to me again in 1906 or 1907, and brought
with him this same Atkinson will in duplicate with
the two codicils, one annexed to each. I had them
there, and he suggested the making of a change at
that time in the executors and trustees under the will.
* * * I made the change in ink, 'Nan Walsh,' and
'Sister Nan,' in the last two lines in the body of the
instrument.

"His idea at first was that, if I would write the
names in there and let it go at that, it would be suffi-
cient, and I, as a lawyer, undeceived him on that
proposition. I told him that the proper method, if he
wanted to make a change of that sort, was to make
a new will. I suggested to him to draft a new will
and re-execute it, a new will to take the place of the
former will and the codicil. That was, as I under-
stood, what he wanted after I explained it to him,
and he said further he wanted it word for word as
that will was. The reason I made those changes in
ink there was a guide for the stenographer. He
wanted it so far as possible to be in the same lan-
guage that appeared in the Atkinson will. The names
were grouped there, and I very seldom draw a will—
I never draw a will in that form. And the idea was to
use as far as possible the exact language of the At-
kinson will; and he wanted no changes unless it was
absolutely necessary so as to put Nan in place of Tom,

and incorporate the codicil which I made in 1905 and the words, 'Sister Nan,' in place of, 'Brother Thomas.' With those exceptions, he wanted it exactly the same as the Atkinson will, and I did not go into the details of what was the Atkinson will with him.

"Then I drafted in duplicate a new will, or rather Miss Down did, for me. I gave her this will to copy and told her to incorporate in it this paragraph that appeared as a codicil."

On May 22, 1908, testator again called on Mr. Black. On this date, the provision for Mr. Trimby in the 1899 will, and retained in the 1906 or 1907 will, was eliminated. No other changes were made. Referring to that subject, Mr. Black testified as follows:

"He came in and said to me, 'Now Tom Trimby is not in my employ now, and I want that paragraph stricken out.' * * * Referring to the will which I had drawn before I drew the 1908 will, he had that with him, he said that the will was all right with the exception that Mr. Trimby was not now in his employ, and that he did not wish to leave him the $500 that was in the prior will, the first will I drew. * * * He didn't want any other changes. * * * On May 22d he came into my office along in the morning about 11 o'clock I think. Miss Down prepared this instrument that is introduced here as his will. Mr. Walsh did not remain in my office while that work was being done by my stenographer. I can't say where he went, but he said he would come back in about an hour, if I remember it right, and did come back in that time. The will had been prepared by my stenographer, the running of it off, while he was gone. When he came back after the will was drafted by the stenographer, I think I was in the office, that is, in the north office, I read the will to him. * * * He said that was just what he wanted. Miss Jean Down and I are witnesses to that will. Mr. Walsh signed this will there in my office, and I saw him sign it. Miss Down was right there looking at him when he signed it in our north office.

"Q. How was it that you and Miss Down put your names here as witnesses to that will?

"A. At the request of Mr. Walsh.

"Q. Where was Mr. Walsh when you and Miss Down each signed that as witnesses?

"A. He was right there in that office, in the north office, where he could see us. After this will was executed, signed by him and witnessed by us, Mr. Walsh took it himself. There was a copy made of it at the time, and that was also executed. Miss Down and I signed each one of them in his presence and at his request, and in the presence of each other, and he signed both of them.

"Q. What did you do with this will, and also the copy of it, or the duplicate of it at that time?

"A. Gave it to Mr. Walsh.

"Q. What did he do with them?

"A. I can't tell, I know what he said he was going to do with them. * * * He said to me, 'I will put one of these in the Commercial Bank and the other one in the St. Clair County Savings Bank.' Then we started, and he asked me up to have lunch with him up here to the Metropole. And we started, we got just across the outer office, when he said, 'No, I will put one of them in the bank and the other in my safe, and if anything happens you can tell the folks.' Now, I was met right there by somebody and went back, and Mr. Walsh went on up to the Metropole, because I followed him up later, and when I got up there he was coming out from dinner.

"Q. Now, let us see whether you and I understand each other. You mean by that that he said he was going to put the 1906 wills in one place and the 1908 wills in another?

"A. No, there were two 1908 wills, they were put in one envelope, and he was going to place one of them in the Commercial Bank, that is what he said, and one in the St. Clair County Savings Bank. He told me that before he left the inner office; then, when we got to the outer office, he said, 'No, I will put one in the bank,' but didn't say which bank.

"Q. One of the 1908 wills?

"A. Yes, 'and the other one I will put in my safe.'

"Q. That is the other 1908 will?

"A. Yes. * * * He told me if anything should happen to him I should tell the folks where 'they are.' He said, 'You can notify the folks if there is anything happens to me.'

"*Q.* Notify them what?

"*A.* Where the wills are; that is what he referred to.

"*Q.* That is what I meant. After you heard of Mr. Walsh's death, did you notify any one?

"*A.* I told, I think, Mr. Joe Walsh what his uncle had told me.

"*Q.* How long was that after the death?

"*A.* Well, now, I think that was after the funeral; I should judge it was the next day. I didn't know whether Mr. Joe Walsh knew about the will or not, and I called his attention to it.

"*Q.* What did he say?

"*A.* He said he would look them up."

Miss Nan Walsh was called by the contestants, under the statute for examination, and upon this subject she testified, in part, as follows:

"*Q.* Now, Miss Walsh, I show you this paper marked 'Exhibit A,' which is the instrument dated May 22, 1908, and this paper marked 'Exhibit B,' which is the socalled Atkinson will, and annexed to which is Exhibit C, the codicil prepared by Mr. Black in 1905, and ask you where those papers came from?

"*A.* At the time of my uncle's death, they were in my safety vault at the Commercial Bank. My uncle had no key to it and never had one. I don't know that he knew I had that safety deposit vault. I don't believe I ever told him. In fact, I know I did not. At the time of his death, Exhibits A, B, and C were in this envelope which is produced here, marked Exhibit E.

"*Q.* How long had those three papers in that envelope been in your personal safety deposit vault of which your uncle had no knowledge?

"*A.* I couldn't say that for sure. I think it was some years. It might be three, four, or five years.

"*Q.* Would you say that it was prior to 1910?

"*A.* I couldn't be sure of that.

"*Q.* When did you first get possession and have possession of those papers?

"*A.* Why these papers, this envelope was given me one day by my uncle in the office at 236 Huron avenue. As to the date it was, I don't know. The only thing I do know it was after the date of this will,

1908, it must have been, because I had the papers from the day he gave them to me, and he said, 'Keep this, lady, you may want them some day,' and I kept those papers.

"Q. Can you fix that, was it in May, 1908?

"A. I couldn't fix that date. * * *

"Q. You couldn't be sure? All right. Then we will pass to the next point, and I will ask you what you did at the time your uncle handed you those papers; what he did, and what you did?

"A. Why, as nearly as I can remember, I had come in from luncheon at noon, and when I came into the office Uncle took this envelope, and he took it out of his inside pocket, and he handed it to me, and said, 'Keep this, lady, you may want them some day.' Then just about that time he took out of his pocket the key to the safe, and he handed that to me; that I was to open up for the afternoon's proceeding, or whatever it was. He put on his hat and went out. That is as near as I can remember.

"Q. Is it not a fact that he gave you the keys to put those papers in the safe, and did you not then and there, in his presence, put those papers in that envelope in his safe, close the door, and hand him back the key?

"A. I don't believe I did. * * *

"Q. This was his safe?

"A. It was.

"Q. By this safe, I mean Robert Walsh's safe?

"A. Yes, sir; in his office where I was employed at the time. I couldn't tell you exactly how long those papers remained in Robert Walsh's safe.

"Q. A day, week, or month?

"A. I would not know that, Mr. Selling.

"Q. Well, were they there a year?

"A. I couldn't be sure of that.

"Q. Haven't you any way of locating the time?

"A. No, I have not, not specially.

"Q. Have you any way of locating the time when you took them out?

"A. Yes, I have, decidedly.

"Q. How?

"A. I took them out the day before my uncle was buried, last February.

"*Q.* You took them out of the safe?

"*A.* No, out of the safety box, I thought you were speaking about.

"*Q.* I asked you about the safe, that is where you say you put them that day that he handed you that envelope and the keys to his own safe?

"*A.* Yes.

"*Q.* When did you take them out of his own safe?

"*A.* I can't tell you that exactly.

"*Q.* It was some considerable period of time?

"*A.* I wouldn't know whether it was; it may have been a month, it may have been a year, it may have been two years, I wouldn't know that for certain.

"*Q.* It wasn't longer than two years, then?

"*A.* I wouldn't be sure of that.

"*Q.* You wouldn't even be sure of that?

"*A.* No.

"*Q.* Can you locate the time when you took those papers out of Robert Walsh's safe and put them in your safety deposit box, of which he had no knowledge?

"*A.* I can't remember.

"*Q.* What was the occasion for your taking that envelope containing those papers out of your uncle's safe and putting them in your own safety deposit box?

"*A.* Why, I would say that I was afraid of fire.
\* \* \*

"*Q.* Was your uncle in Port Huron at the time you did it?

"*A.* I couldn't tell you that, Mr. Selling.

"*Q.* You didn't tell him you were going to do it before you did it, did you?

"*A.* I never spoke of it to him.

"*Q.* You never told him you were going to do it, and you never told him you had done it, isn't that true?

"*A.* I never did.

"*Q.* So your uncle never knew up to the day of his death that you had those papers in the envelope in your own private safety deposit box at the Commercial Bank to which only you had access, is that right?

"*A.* I don't know that he did.

"*Q.* Well, he did not from you, did he?

"*A.* He knew I had them; he had told me to keep

them safe. I never told him, and he never had asked me. He gave them to me to keep safe, and he knew I would do it.

"*Q.* And he handed you the keys to his safe at the time, is that right?

"*A.* I couldn't say he did them both at one time.

"*Q.* You said at the same time. Was it not at the same time? Didn't he hand you the keys to the safe at the same time that he handed you the envelope?

"*A.* Why, it was about the same time.

"*Q.* What do you mean by about the same time?

"*A.* Why, he took those papers from his inside pocket and he handed them to me, and he said, 'Keep this, lady, you may want them some day.' Then, a few minutes after, he took and handed me the keys. He always handed me the keys to the safe when I came in in the afternoon."

The printed record in this case contains nearly 1,200 pages. We find it will be impracticable to copy at great length the testimony in this immense record. We shall content ourselves with stating the substance of it. There was testimony pro and con as to the mental capacity of the testator, extending over a period of many years before his death, which occurred in Florida on February 22, 1914. This question of mental capacity was submitted to the jury in a very elaborate charge, and we shall spend no time in considering whether the question should have been submitted to the jury; and the same may be said of the question of undue influence, which question was also submitted to the jury.

The testator had, for a number of years prior to his death and prior to his going to Florida in the fall of 1913, spent his winters in California.

The duplicate of the will of 1908 retained by Robert Walsh has never been found, although due search was made.

As bearing upon the subject of revocation of the will in question, the contestants produced testimony of

statements made from time to time by the testator. Among others, it was testified to by contestant Robert Flattery that, in 1909, when Mr. Flattery and his wife were visiting the testator, Mr. Flattery had said to his uncle:

"Uncle, on these trips out to California, if anything should happen to you, have you got your things fixed —got a will fixed?"

To which the testator had replied:

"Will, be 'dang!' Everything will be share and share alike," but says, "I do want $5,000 for Father McManus."

This testimony is corroborated by that of Mrs. Flattery.

There was also testimony that in 1909, when Mrs. Mary A. Walsh, the widow of Patrick J. Walsh of Detroit, accompanied by her three daughters, came to Port Huron to see him, he said to her: "Mary, you are getting old. Have you made a will?" To which she replied, "No, I haven't made a will." And he said:

"Well, you might just as well not make a will. It is better not to make a will. But, if you do make a will, the only way any one should make a will is share and share alike. I don't make any will at all."

There was also testimony of Miss Coleman, the trained nurse who came to take care of testator after his return from California in the spring of 1913, and who continued to take care of him until he died. She testified to the condition of his mind much of the time while in Florida. She testified, in substance, that about a month before testator was taken to Florida, probably in October, 1913, he asked her to call Joseph Walsh on the telephone, which the nurse did, and, not being able to get Joseph Walsh, left a message, and, Robert Walsh seeming rather restless, the nurse said, "Uncle, do you want to see Joe on business of im-

portance?" And he said, "Lady, I want to make a will."

It appears from the record that the testator had been somewhat irritated and annoyed by letters written him by one of the Detroit family with reference to property matters in which the testator and Patrick J. Walsh were interested, this property being located at Port Huron and having been in charge of the testator, who had made certain improvements upon the property and had retained the rents to reimburse himself; and this niece Ellen Grace Walsh Kennedy had written him letters, and it is claimed that he expressed a determination to cut her out, or cut her off from sharing in any portion of his estate.

Much time was spent in the examination and cross-examination of Miss Coleman as to whether he said he desired or wanted to "make a will," or to "change a will"; the witness Miss Coleman being of the opinion that he said he wanted to "make a will." This witness also testified that about three weeks before his death he said that, if it had not been for the trouble "that one" made for him, they would all fare alike; and the witness inferred that the term "that one" referred to Grace Kennedy.

On the part of the proponents, there was much testimony tending to show his affection for, and the deep interest which he took in, the Port Huron branch of the family, called sometimes the "favored ones" in this record; and there are many letters to different members of this family, and especially to Nan Walsh, who seems to have been his confidential clerk during a large portion of the years covered by the testimony, expressing the interest which he took in the family, and containing many inquiries regarding their welfare. There was also testimony tending to show that he was desirous of having different members of this family, especially the young women, take an interest

in the business and property which he owned at Port Huron, saying that it would be theirs some day, and that he wanted them to learn how to care for it.

Aside from the testimony on behalf of the contestants, above referred to, there was nothing in the conduct of the testator, from the time he made what may be termed the "Atkinson will," in January, 1899, down to the time of his death, to show that he had in any way changed in his feelings toward or interest in the proponents, and the other members of the Port Huron Walsh family. This conduct covers many years prior to the death of the testator, and we think is significant as showing the state of mind of the testator and his determined purpose to provide liberally for them.

We shall now proceed to consider some of the questions raised, and rulings of the court upon the trial of the case at the circuit. There are 358 assignments of error, and it would be interminable for us to consider these assignments separately. We shall endeavor to dispose of them as we proceed with the case.

The first question which we shall consider, being raised by an asignment of error, is the claim:

(1) That the court erred in refusing to permit all of the contestants to have more than four peremptory challenges upon the impaneling of the jury.

While it may be somewhat doubtful whether the question is properly before us, the court having simply stated what it would do were a further peremptory challenge made, yet we are disposed to treat the matter upon its merits. All are familiar with the statute which provides that each party may challenge peremptorily four jurors. In this case, all the contestants filed the same objections and appeared by the same counsel in the probate court. All of the contestants signed the same claim of appeal. One bond was filed signed by all. In the circuit court, four sets of attorneys claimed to represent different contestants.

(2) At the close of the testimony, the court denied a motion on behalf of the contestants for the direction of a verdict upon the grounds stated in the following request:

"The evidence in this case shows undisputedly that the instrument alleged to be the last will and testament of Robert Walsh was executed in duplicate. I charge you that both duplicates constitute but one will, and that the destruction of the one by Robert Walsh with intent to revoke such will would, in the eyes of the law, be considered as a destruction of both duplicates, and that under the evidence the duplicate which appears to have been last in his possession, custody, and control, not having been produced, or its absence accounted for, the presumption is that Robert Walsh destroyed the same with the intention of revoking it; inasmuch as the two duplicates constitute but one will, that same presumption would apply to the duplicate of the alleged will produced, and your verdict must therefore be in favor of the contestants and against the admission to probate of said duplicate."

Error is assigned upon the refusal to give this request.

Contestants maintained in the court below that the testimony offered by the proponents to overcome said presumption was not, as matter of law, sufficient to overcome the same, or to bring proponents within any of the exceptions to the rule.

(3) Failure to call Jean Down, one of the subscribing witnesses.

This witness had been examined upon the hearing in the probate court. It appeared that she resided out of the State of Michigan, and in Chicago. Proponents offered to read her testimony, taken in probate court, which had been extended and its correctness testified to by the stenographer. This offer being objected to by the contestants, the same was withdrawn. It is claimed that this failure to call this witness was reversible error.

(4) Upon the trial there was testimony relating to certain conduct and statements of Joseph Walsh, proponent, at the home of his uncle Patrick J. Walsh just prior to the latter's death, and shortly before the making of what is termed the Atkinson will. This evidence was admitted, but the court limited its use merely for the purpose of testing the credibility of Joseph Walsh, but denied its use as substantive evidence, and in its charge to the jury so limited the use of such testimony, and instructed the jury that the statements could not be used as proof that undue influence was exercised by Joseph Walsh. The following request was proffered by contestants and refused by the court:

"If you find that Joseph Walsh, on the Friday before Patrick J. Walsh's death, went to Patrick J. Walsh's house and had a controversy with him with reference to an attempt upon the part of Joseph Walsh to have Patrick J. Walsh deed to the Port Huron Walshes certain property in Detroit which Patrick Walsh refused to do, and if you find that Joseph Walsh threatened to get even, then you must consider whether or not Joseph Walsh did endeavor to get even, and whether through his influence, and the influence of others, the Atkinson will was made in the following month, whereby the Detroit Walshes were left but $1,000 each and the great bulk of the estate left to the Port Huron Walshes."

Error is assigned upon this refusal.

(5) It appeared in evidence that the testator's wife procured a divorce from him in 1885; that the case was appealed to this court and the decision handed down in June, 1886. It also appeared that the record in that case contained a large number of letters which had been written by the testator to his wife before and pending that litigation. Those letters are referred to in the opinion in *Walsh* v. *Walsh*, 61 Mich. 554 (28 N. W. 718), where the writer of the opinion said:

"They (Walsh's letters) are such as no man, in any rank of life, could write to his wife, in his right senses, unless he was brutal and beastly in his nature. * * * They are, indeed, more like the crazy ebullitions of an insane man than they are the production of any reasonable, decent human mind."

These letters were offered in evidence for the purpose of showing the mental state or condition of the writer's mind at the time they were written. Those letters cover a period running from 1879 to 1883. The letters, upon objection, were excluded by the court, as was also the opinion of this court in that case, to all of which exception was duly taken.

(6) Objection was made, and overruled, to certain testimony of Frank C. Wellman, cashier of the St. Clair County Savings Bank, as to the mental competency of the testator. The folowing questions were asked:

"*Q.* From your observation of Mr. Walsh from the time he opened the account in 1902 up to two years before his death, what is your opinion of his mental capacity to transact business? (This question was objected to, the objection overruled, and an exception taken, and the witness answered:)

"*A.* I should judge that he was competent to transact any business that he desired. * * *

"*Q.* Now, was Mr. Walsh, in your opinion, during the time he was making these deposits and doing the business in your bank, in a mental and physical condition to transact business requiring an exercise of judgment and the reasoning faculties and consecutive thought on his part? (Objection and exception.)

"*A.* In my opinion he was."

It is claimed this was error.

(7) Questions to expert witnesses Drs. Babcock and Kennedy.

In the direct examination of Dr. Babcock, the following occurred:

"*Q.* Assuming that to make the will in question

the jury must be satisfied that Robert Walsh at the time of making this will in May, 1908, which discriminates among his relatives, that not only he had sufficient memory to recall the several persons who might or ought to be the fitting objects of his bounty, but sufficient understanding to comprehend his relationship to them, their relationship to him, and their claims upon him, that that is the law, would you say that a person suffering from *senile dementia* has that sufficient memory?

"*Mr. Avery:* I object to that question as invading the province of the jury, (Objection sustained. Exception.)

"*Mr. Selling:* Your honor gives me the exception if it is on the legal proposition as to our right to put a question of that sort, I would like to be heard, if the court please.

"*The Court:* No, it is the form of the question.

"*Q.* The will in question here, Doctor, is what is known as a discriminatory will; he leaves different sums to different relatives who are in the same degree of relationship both as nephews and nieces and as grandnephews and grandnieces. Assuming that to make such a will a person must have sufficient memory to recall the several persons who might or ought to be the fitting objects of his bounty, and sufficient understanding to comprehend his relationship to them, their relationship to him, and their claims upon him, would you say that a person suffering from *senile dementia* had that mental competency? (Objected to, objection sustained, and exception.)

"*Q.* Would you say that a person suffering from *senile dementia* would have sufficient memory to recall the several persons who might or ought to be the fitting objects of his bounty, and sufficient understanding to comprehend his relationship to them, their relationship to him, and their claims upon him?

"*Mr. Avery:* The same objection. (Objection sustained. Exception.)

"*Q.* What can you say in general as to the ability of a person suffering with *senile dementia* to make a discriminatory will; that is, a will treating persons in the same degree of relationship in a different manner and with different bequests in amount and nature? (Same objection, ruling, and exception.)"

Subsequently, after the witness Dr. Babcock had given his testimony, the court stated that it would permit an answer to the question:

"Would you say that a person suffering from *senile dementia* would have sufficient memory to recall the several persons who might or ought to be the fitting objects of his bounty, and sufficient understanding to comprehend his relationship to them, their relationship to him, and their claims upon him?"

Upon the close of the examination, that question was put to the witness Babcock, and the answer was: "I should say not in all instances."

Similar questions put to the witness Dr. Kennedy received similar rulings. These witnesses were examined at great length, as appears by the record. Error is assigned upon these rulings.

(8) Requests of contestants Flattery to charge. The fifteenth request to charge reads as follows:

"The jury may consider the nature and character of the will, and, if it be contrary to natural justice, this, with the other facts of the case, may be considered by the jury in the determination of the question whether or not the testator was of sound mind."

This request was refused, and error is assigned upon the refusal.

The twenty-ninth request was as follows:

"The jury is instructed that, while a man is not to be regarded as of unsound mind simply because the provisions of his will are unjust, yet the jury have a right to take into consideration the provisions of his will; and if they find them to be unjust, in view of the claims that his relatives rightly had upon his bounty, the jury have a right to consider this fact, in connection with all the other circumstances of the case, in determining whether or not Robert Walsh had sufficient mental capacity to make this will."

This request was also refused, and error is assigned upon it.

The twenty-sixth request to charge reads as follows:

"Men may have mental capacity to comprehend a few simple details, but when an estate is large, requiring the remembrance of many facts and the comprehension of many details, and the disposition to be made is complicated, and there is a great discrimination between relatives of the same degree, it requires greater mental capacity than simply to make a will, leaving to all relatives of the same relationship his property, share and share alike; and you must, in determining mental capacity, determine whether Robert Walsh had sufficient mind and memory to make the discriminatory will now offered here for probate."

Also, the twenty-seventh request:

"It is claimed by the contestants in this case that Robert Walsh, at the time of the making of the instrument presented for allowance here, was suffering from *senile dementia*, a condition of the mind due very often to the hardening of the arteries leading to the brain, often found in persons of advanced years who have led sedentary lives and who have had a great deal of mental stress or worry. Unless those offering the will for probate convince you by a fair preponderance of the evidence that Robert Walsh did not have *senile dementia*, or that the discriminations in his will were not due thereto, then you must find against the will in question."

None of the foregoing was given in the language stated, and error is assigned thereon.

The contestants Emma Keith and others assign error upon the following portion of the charge:

"Now, if this duplicate copy was destroyed by Robert Walsh before he handed the other duplicate copy to Miss Nan Walsh, there can be no conclusive presumption that he destroyed it with intent to revoke it, and under those circumstances the destruction of the duplicate copy by Robert Walsh, before the time he handed the other duplicate copy here produced to Miss Nan Walsh, does not necessarily invalidate the duplicate copy here produced.

"In other words, if Robert Walsh destroyed one of

the duplicate copies of the paper, while he had both in his possession, and then afterwards handed the remaining duplicate copy to Miss Nan Walsh with instructions to her to keep it, these facts taken together raise no conclusive presumption that he destroyed the duplicate with intent to revoke the instrument, and if you so find from all the testimony, facts, and circumstances, then you would be justified in finding that Robert Walsh, by the destruction of one of the duplicate copies, did not intend to revoke the instrument that he had executed, and that the instrument here offered is the last will and testament of Robert Walsh, deceased."

Also the following:

"On the other hand, if you find from all the testimony, facts, and circumstances, that Robert Walsh retained in his possession one of the duplicate papers after he had given one of them into the possession of Miss Nan Walsh, the nonproduction of this duplicate instrument so retained by him raises a presumption that, not only Robert Walsh destroyed this duplicate instrument, but also that he destroyed it with intent to revoke the will which he had so executed in duplicate, and if you so find you will return a verdict that the purported will here offered is not the last will and testament of Robert Walsh, deceased."

The court added the following:

"However, if at any time, either before or after the delivery of the duplicate copy of the paper to Miss Nan Walsh, Robert Walsh destroyed one of the duplicate copies of the instrument with intent to revoke it, that act would constitute a revocation of the instrument and defeat the will."

The question whether the verdict was contrary to the weight of the evidence is not before us, and will not be considered; the record failing to show any motion for a new trial.

We shall consider the subjects in the order in which they have been stated.

1. Number of challenges allowed contestants.

It should be borne in mind that the issue here was, will or no will. No matter how many different persons appeal in a will case, they can only raise one issue, and there can be but one trial of that issue, which is to determine the question of will or no will. The rule seems to be that where the issue was a single one, and where there could be but one verdict, it was as though there was but one party before the court; but where there were different issues and different parties, and there could be different judgments against the various parties, that the rule is different. *Stroh* v. *Hinchman*, 37 Mich. 490. This doctrine was approved in a later case, in a will contest, where an attempt was made to have separate challenges for the separate contestants. The lower court denied this claim, and Justice COOLEY, in affirming this decision, said:

"The ruling was within the decision of *Stroh* v. *Hinchman*, 37 Mich. 490. and requires no discussion." *Fraser* v. *Jennison*, 42 Mich. 206, at page 211 (3 N. W. at page 884).

Contestants cite the case of *Yonkus* v. *McKay*, 186 Mich. 203 (152 N. W. 1031). In that case, it appeared that different judgments might be entered. This court said:

"All of the defendants are not liable to the same extent, or for the same reason, or in the same manner."

Therefore it was held that separate challenges were proper. We think the case readily distinguishable from the instant case, and that the court did not err in this ruling.

2. Revocation. This presents the principal question in the case in our judgment.

The question here presented, when applied to a duplicate will, is a most interesting one and appears to be a new question in this State. Does the same rule apply as in the case of a single will? Counsel for proponents concede that in case of a single will which

has been traced to testator's possession, and is missing at his death, the law raises a presumption that he destroyed it, and that he did so with intent to revoke it. The authorities upon the subject are not numerous, but they all seem to be to the effect that the same rule applies in the case of a duplicate will.

In 1 Jarman on Wills (6th Ed.), p. 151, that author says:

"Sometimes a testator for greater security executes his will in duplicate, retaining one part, and committing the other to the custody of another person (usually an executor or trustee); and questions have not unfrequently arisen as to the effect of his subsequently destroying one of such papers, leaving the duplicate entire. In these cases, the presumption generally is that the testator means by the destruction of one part to revoke the will, but the strength of the presumption depends much upon circumstances."

See, also, Thornton on Lost Wills, § 68.

But this presumption of revocation may be rebutted, the same as in other cases. While there is much force in the argument that the reason why a will is made in duplicate is that if one becomes lost, mislaid, or destroyed, the other will be found and put into effect, yet the uniform rule seems to be as above stated.

The last expression of this court upon the subject of lost wills is in *Re Keene's Estate,* 189 Mich. 97 (155 N. W. 514). There Justice KUHN said:

"It is without question the rule of law that, where a will cannot be found at the death of the testator upon proper search being made, and especially where the will is not traced out of the possession of the testator, it is to be presumed that it was destroyed by him *animo revocandi.* But it is also established in this State that this presumption of revocation can be met by declarations of the testator. It was said in *Ewing* v. *McIntyre,* 141 Mich. 506, 517 [104 N. W. 787, 791]:

"'But counsel for contestants contend that the declarations of the testator were not competent evidence to rebut the presump-

tion of revocation, and that the great weight of authority is to
that effect. * * * We do not deem it necessary to enter upon
a discussion of the authorities to determine on which side the
weight of authority lies, since the rule has been established in
this State against contestants' contention. *Lawyer* v. *Smith*, 8
Mich. 412 [77 Am. Dec. 460]; *Harring* v. *Allen*, 25 Mich. 505;
*In re Hope*, 48 Mich. 518 [12 N. W. 682]; *In re Lambie's Estate*,
97 Mich. 50 [56 N. W. 223]; *Cheever* v. *North*, 106 Mich. 390 [64
N. W. 455, 37 L. R. A. 561, 58 Am. St. Rep. 499].'

"It was also said in *Re Foerster's Estate*, 177 Mich.
574, on page 585 [143 N. W. 616, on page 620]:

" 'Whether or not the presumption of revocation is rebutted is
a question for the jury. Thornton on Lost Wills, § 73, citing
cases.' "

*Managle* v. *Parker*, 75 N. H. 139 (71 Atl. 637, 24 L.
R. A. [N. S.] 180, Am. & Eng. Ann. Cas. 1912A, 269),
is a well-considered and interesting case. It is there
held that, where a will is executed in duplicate, the
presumption of an intent to revoke the same, arising
from the testator's act in destroying the copy in his
custody, is not an irrebuttable conclusion, but is a mere
inference of fact; that such will is not revoked by the
mere destruction by the testator of the copy in his
possession, if he understands that the other copy is
left in force; that where, in such a case, there is evi-
dence to rebut the presumption of revocation by the
destruction of the copy in the testator's possession, the
question of revocation is one of fact for the jury. In
that case, the evidence tended to show that the paper
offered for probate was executed as a will by Hannah
Stevens, September 14, 1899. Before it was signed
and witnessed, a line was crossed out. Shortly there-
after a second draft, identical with the first draft ex-
cept for the erasure, was executed before the same wit-
nesses at the request of the attorney who drew the
will, because he did not wish a paper prepared by him
to go to probate in the condition of the first draft.
When the second draft was signed, Miss Stevens gave

the first to one of the witnesses, Mrs. Noyes, "to keep in case anything happened" to the second, which testatrix retained in her possession. Mrs. Noyes kept the first draft until about three weeks before Miss Stevens died, when it was delivered to an attorney, who retained it until it was offered for probate. Miss Stevens kept the second draft in her own possession, and within two years voluntarily destroyed it by tearing. At that time she declared that she did not like it, and would not have it. She died August 12, 1906. Subject to the defendant's exception, Mrs. Noyes testified that about two years after the will was made the testatrix asked if she still had the paper which had been given to her, and said that the one she had kept had been destroyed because some of her relatives had made a fuss; that the testatrix said she had earned the money herself, had a right to dispose of it as she saw fit, and would like to see the faces of her relatives when the will was read. Subject to the same exception, Dr. Danforth testified that about two weeks before her death Miss Stevens said that she was very fond of Minnie (the residuary legatee) and did not know how she could get along without her; that she was going to take care of, or provide for, Minnie if it lay in her power; and that "that was fixed." Among other things, the court said:

"From the facts surrounding the execution of the two documents by the deceased, it could be found that she intended them for duplicate wills, and that she understood that the copy left with her neighbor would continue to be her will, no matter what was done with the copy she herself retained. There is no evidence (other than by way of presumption) that the testatrix ever had a different understanding. It is true that there was evidence that at the time she destroyed the copy of the will in her possession she said she did not like it and would not have it. Undoubtedly, this was sufficient evidence to support a finding that she intended to revoke her will; but it was not a preferred

class of evidence of intent. Taken in connection with the evidence of her understanding as to the force and effect of the other copy, and considering the fact that she allowed that copy to continue in the custody of her near neighbor and friend for five years after the destruction of the copy she herself had, the evidence of intent to revoke the existing copy is of a dubious sort. That is, there are facts in evidence from which different inferences may be drawn."

The will was sustained in that case. Reference is here made to the note to this case in Am. & Eng. Ann. Cas. 1912A, 273.

One of the latest and best-considered cases we have found upon the subject of lost wills (decided in 1913) is *Jackson* v. *Hewlett*, 114 Va. 573 (77 S. E. 518). Many English and American cases are there reviewed, including *Ewing* v. *McIntyre, supra,* and it was held that where the due execution and contents of a will are admitted or clearly established, but it cannot be found upon the death of the testator, and the cause of its disappearance is unknown, it is permissible, in order to repel the presumption of revocation by the testator, to prove the declarations of the testator made anterior to the making of the will, coincident with its preparation and execution, and subsequent to its execution, showing his state of mind and determined purpose to provide liberally for the legatee named in the will, and his state of mind as to other relations and his desire that they should not have his estate at his death; that such declarations, repeated and persisted in from a time anterior to the making of the will up to within a few days of his mental and physical helplessness culminating in his death, establish a continued and unchanged purpose as to the disposition he desired to make of his estate, and negative the presumption that he had destroyed his will with intent to revoke it; that evidence to the testator's original purposes, and the mental attitude on which they were founded, of the

condition out of which that mental attitude arose, of the consummation of the purpose in the will itself, and of the continuance of the conditions which produced the original mental attitude, all bear on, and relate to, the continuance of that attitude, and tend to negative the presumption of revocation.

In the instant case, we have first the uncontradicted fact that the testator as far back as 1899 executed a will which was to all practical purposes identical with the will here offered. It appears that he took great care in the preparation of that will; that he consulted Mr. Atkinson, his attorney, several times in regard to it. That will showed a carefully thought out scheme of distribution. It remained unchanged until 1905, when a codicil of no practical importance was added. In 1906 or 1907, the testator decided to change one of his executors, and, instead of adding another codicil, a new will was made, incorporating the codicil and this change. The original plan was strictly adhered to, and the exact language was preserved, under his direction. In 1908, a new will was drawn with only a minor change, and the exact provisions and language of the so-called Atkinson will were otherwise retained. Testator's plan had never changed during this period of nine years. It appeared by the testimony of Mr. Moore that testator's expressed reason for making the will was that the only human interest which he had was in the Port Huron family of Walshes. There is no evidence that this affection ever changed to the last moment of his life. There is no evidence that testator's property in any way changed so as to form a reason for revoking his will. The draft of the will produced at the hearing had been placed in the hands of one of the executors for her to take care of, he saying: "Keep this, lady, you may want them some day." We are of opinion that the facts and circumstances were sufficient to be submitted to the jury, and that the trial .

court did not err in refusing to direct a verdict for the contestants.

3. Was there error in the ruling as to the failure to produce Jean Down at the trial? She was out of the State. She had testified in the probate court. That testimony was offered by proponents at the trial, but, being objected to by contestants, was withdrawn. Under our holding in *Abbott* v. *Abbott*, 41 Mich. 540, 543 (2 N. W. 810), and it appearing by this record that no real issue was made as to the execution of the will in question, we think there was no reversible error in the ruling upon this question. And we think that the court did not err in charging the jury that the statutory formalities in the execution of the will had been complied with.

4. Was there error in restricting the testimony as to the conduct and statements of Joseph Walsh at the home of Patrick J. Walsh just prior to the latter's death? It is claimed that the court erred in restricting the use of this testimony to be considered merely for the purpose of testing the credibility of Joseph Walsh, the proponent and one of the legatees. We think the ruling was correct. *In re Ganun's Estate*, 174 Mich. 286 (140 N. W. 561); *In re Shanahan's Estate*, 176 Mich. 137 (142 N. W. 573).

5. Did the court err in refusing to admit in evidence the letters used in the divorce case of *Walsh* v. *Walsh*, *supra*, and in excluding the opinion in that case? We think not. We are of opinion that the letters were too remote in point of time, having been written a quarter of a century before the will in question was made. They were not material as tending to show the state of mind of the testator when the will was made. The opinion in the divorce case was not an adjudication of any question involved in the instant case. From the opinion it appears that this court granted the divorce on the ground of extreme cruelty, "proven out of de-

fendant's own mouth by these letters." It is apparent therefore that the defendant in that case was held to be of sound mind and responsible for his acts and conduct.

6. Did the court err in receiving the testimony of the witness Wellman as to the competency of the testator? Bearing in mind that soundness of mind, or sanity, is the normal condition, and that there is a difference in the nature of the testimony requisite as a basis for opinions in the two cases of sanity and insanity, we do not think that the court erred in that regard. *People* v. *Borgetto*, 99 Mich. 336 (58 N. W. 328) ; *Lamb* v. *Lippincott*, 115 Mich. 611, 617 (73 N. W. 887).

7. Did the court err in sustaining the objections to the questions asked the expert witnesses? Under the holding of this court in *Page* v. *Beach*, 134 Mich. 51 (95 N. W. 981), and in view of the extended examination of these witnesses which was permitted, we do not think that the rulings complained of constituted reversible error.

8. Requests to charge of contestants Flattery. We have examined with care the charge of the court and the requests to charge which were refused. We are of the opinion that the charge fairly covered the issues in the case, and correctly stated the legal propositions involved. The jury were instructed that they might consider the provisions of the will itself, in determining its validity. While some of the requests which were refused might well have been given, we are of the opinion that their refusal was not reversible error.

Referring to the assignments of error of contestants Emma Keith and others relating to the part of the charge above quoted, and the argument of counsel that there was no testimony from which the jury could determine at what time Robert Walsh destroyed the duplicate, and that the charge forced the jury to guess

and speculate upon this point, counsel for proponents say that contestants cannot make such a claim in view of their request which was given, and which was as follows:

"In order for you to find that the duplicate retained by Robert Walsh was not in existence at the time the other came into the possession of Miss Nan Walsh, you must be convinced by a preponderance of the evidence that such duplicate had been actually lost or destroyed before that time."

And it is urged that having recognized at the trial that evidence existed upon this subject, and having asked the court to so charge, they cannot now be permitted to allege that no such evidence existed. We are of opinion that the portion of the charge complained of, in view of what the court said immediately following, was not erroneous.

An examination of this voluminous record, and the extended briefs of counsel, satisfies us that there is no substantial or reversible error in the case, and we cannot say that in the trial, or in the result, there was a miscarriage of justice.

The judgment of the court below is therefore affirmed. Reassigned at April term, 1917.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., took no part in the decision.