IN THE MATTER OF THE WILL OF HENRY J. WALL, DECEASED.

(Filed 24 November, 1943.)

**1. Wills § 16b—**

The rule generally followed by the courts, where the probate of duplicate wills has been considered, is that, where the duplicate copy retained by the testator is not produced or its absence satisfactorily accounted for, the other copy may not be admitted to probate.

**2. Wills §§ 13, 16b, 22—**

The fact that a will was executed in duplicate does not alter the rule that a will left in the custody of the testator, which cannot be found after his death, is presumed to have been intentionally destroyed by him *animo revocandi.* This presumption is of fact and may be rebutted by evidence.

**3. Evidence § 54—**

A presumption of law is generally indicative of a mandatory deduction which the law directs to be made, in the sense of a rule of law laid down by the court; while a presumption of fact is a deduction from the evidence, a *prima facie* case, having its origin in the well recognized relation between certain facts in evidence and the ultimate question to be proven.

APPEAL by caveators from *Hamilton, Special Judge,* at April Term, 1943, of WAKE. New trial.

This was a proceeding to probate in solemn form the will of Henry J. Wall. Upon the evidence offered there was verdict for propounders, and from judgment sustaining the will, caveators appealed.

*Banks Arendell and P. H. Wilson for propounders, appellees.*

*Jones & Brassfield, William T. Hatch, and A. R. House for caveators, appellants.*

DEVIN, J.    It was not controverted that the paper writing propounded for probate was executed in manner and form sufficient to establish it as the last will and testament of the decedent.    But its validity for that purpose was challenged by the caveators on the ground that the will had been executed in duplicate, one copy of which had been left in the custody of counsel and the other retained in possession by the testator, and that the copy left with counsel had been offered for probate while the duplicate copy which had been retained by the testator himself had not been produced or found.    From this, it was contended, the presumption arose that the testator had destroyed it with intent to revoke it as his will, and that the revocation of the duplicate copy in his possession necessarily carried with it the revocation of the copy in the hands of his counsel.    From an adverse judgment below the caveators bring the case here for review.

This is the first instance in which questions relating to the probate of a will executed in duplicate have been presented to this Court for decision.    The facts were these : The draftsman of the will, Mr. J. W. Bunn, at the suggestion of the testator, caused the will to be typewritten in duplicate—that is, by the use of carbon paper, two identically written papers were prepared.    Both papers were signed by the testator and attested by two witnesses, at the same time, thus constituting them duplicate originals.    One of the duplicates was left in the custody of Mr. Bunn, and the other duplicate was retained by the testator and carried to his home.    Some ten months later the testator died.    Mr. Bunn delivered the duplicate copy of the will left in his custody to the clerk for probate.    The other duplicate copy which had been retained in possession by the testator was not produced and could not be found.

The rule generally followed by courts where the probate of duplicate wills has been considered is that where the duplicate copy retained by the testator is not produced or its absence satisfactorily accounted for, the other copy may not be admitted to probate as the testator's last will and testament, for the reason that the presumption of revocation would arise from proof of the possession of the paper by the testator before his death and its unaccounted for absence thereafter, and the revocation of the duplicate copy retained by the testator would necessarily constitute a revocation of the copy in the custody of another person.    This seems to be the rule adopted by the New York courts.    *Crossman et al. v. Crossman et al.,* 95 N. Y., 145 ; *Roche v. Nason,* 185 N. Y., 128 ; *In re Schofield's Will,* 129 N. Y. S., 190 ; *In re Field's Will,* 178 N. Y. S., 778 ; *In re Moore's Estate,* 244 N. Y. S., 612.

In the last case cited, *In re Moore's Estate, supra,* the will was executed in triplicate.    After the testator's death two copies which had been in the custody of others, were offered for probate, but the one

retained by the testator was not found. There being no evidence of its existence at the time of his death, probate of the wills offered was denied. The Court said: "It is a fair presumption that the testator has destroyed his will with intent to revoke it where it was last seen in his possession and cannot be found after his death."

The same reasoning was applied by the Supreme Court of Pennsylvania, *In re Bates,* 286 Pa., 583, 134 Atl., 513, where it was held that the fact that the will was executed in duplicate did not alter the rule that a will left in the custody of the testator which cannot be found after his death is presumed to have been intentionally destroyed *animo revocandi.* It was also said in that case, "had the original been found, or had it been shown to have been lost or accidentally destroyed, there can be no doubt of the admissibility of the duplicate and its being entitled to probate as the testator's will."

In the annotation on this subject in 48 A. L. R., 297, authorities are cited in support of the rule stated that where a testator destroys or is presumed to have destroyed with intent to revoke the copy of his duplicate will retained in his possession, in the absence of proof to the contrary, the duplicate in another's hands will be held revoked. The same principle is stated in 68 C. J., 822, with citation of a number of decisions from different jurisdictions in support.

In *Goodale v. Murray,* 227 Iowa, 843, 126 A. L. R., 1121, it was said, "The rule is practically unquestioned that in the absence of any evidence as to circumstances of destruction, a presumption arises that a will which was in the custody of a testator, and which cannot be found at his death, was destroyed by him with the intention of revoking it." In order to revoke a will there must be both the physical act of destruction or cancellation and the intention that the act have this effect. Both must concur. The presumption, however, that the testator destroyed the paper with the intent to revoke it as his will is not one of law but of fact, and may be rebutted by evidence of facts and circumstances showing that its loss or destruction was not or could not have been due to the act of the testator or that of any other person by his direction and consent.

In *In re Hedgepeth,* 150 N. C., 245, 63 S. E., 1025, where the copy of a lost will was attempted to be probated, it was said, "The will not being found, there is a presumption of fact that it was destroyed by the testator *animo revocandi,*" and that the burden was on the propounder "to show the original will was lost or had been destroyed otherwise than by the testatrix or with her consent or procurement."

In *In re Steinke's Will,* 95 Wis., 121, it was said that if it appeared that the will was last known in the possession of the testatrix and after her death could not be found "a *prima facie* presumption would arise

that she had destroyed it, with the intention of revoking it—a presumption subject to be rebutted by competent evidence." To the same effect is the holding *In the Matter of Johnson's Will,* 40 Conn., 587; *In re Walsh's Estate,* 196 Mich., 42, and *McClellan v. Owens,* 335 Mo., 884. "Whether or not the presumption of revocation is rebutted is a question for the jury. Thornton on Lost Wills, sec. 73, citing cases." *Re Foerster's Estate,* 177 Mich., 574 (585). The rule that the presumption of revocation, which arises from the fact that the duplicate copy of the will retained by the testator cannot be found after death, is a rebuttable one, is illustrated by the case of *Glockner v. Glockner,* 263 Pa., 393, where the lost will was last seen in the possession of the testator, and evidence was offered that it was thereafter physically impossible for him to have destroyed the will or procured its destruction to the time of his death. It was held that the presumption that he destroyed it with intent to revoke it was rebutted, and judgment sustaining the will was affirmed. An even stronger case for the propounder was *Managle v. Parker,* 75 N. H., 139. There the will was executed in duplicate, and the testatrix herself destroyed the copy she had retained. But it was shown that she did so not for the purpose of revocation, but to appease some of her relatives, expressing the intention that the other copy in custody of another should continue to represent her will. Judgment sustaining the will was affirmed. A statement of this principle, as it applies to the probate of a will executed in duplicate, is also found in 2 Greenleaf on Evidence, sec. 682, from which we quote: "If the will was executed in duplicate, and the testator destroys one part, the inference generally is that he intended to revoke the will; but the strength of the presumption will depend much on the circumstances. Thus, if he destroys the only copy in his possession, an intent to revoke is very strongly to be presumed; but if he was possessed of both copies and destroys but one, it is weaker."

What is the nature and effect of the presumption of revocation to which these circumstances give rise? A distinction was drawn by *Walker, J.,* speaking for the Court, in *Cogdell v. R. R.,* 132 N. C., 852, 44 S. E., 618, between a presumption and an inference. This was said in reference to the question whether one whose death was caused by the negligence of another was presumed to have exercised due care, or whether from the instinct of self-preservation an inference to that effect would arise. The Court held in that instance it was a presumption rather than an inference. This distinction is discussed in Annotation in 95 A. L. R., 162, where numerous cases on the subject are collected. However, the term presumption as connotating a presumption of law is generally used as indicative of a mandatory deduction which the law directs to be made, in the sense of a rule of law laid down by the Court,

while a presumption of fact used in the sense of an inference is a deduction from the evidence, having its origin in the well recognized relation between certain facts in evidence and the ultimate question to be proven. *Rose v. Tel. Co.,* 328 Mo., 1009, 81 A. L. R., 400; *Judson v. Bee Hive Auto Service,* 136 Oregon, 1, 74 A. L. R., 944; *Merkel v. Railway Association,* 205 Mo. App., 484; *Indianapolis v. Keeley,* 167 Ind., 516; 1 Greenleaf on Ev., sec. 48 (note).

In the case of *S. v. Davis,* 214 N. C., 787, 1 S. E. (2d), 104, the effect of *prima facie* or presumptive evidence is discussed by *Barnhill, J.,* and in *S. v. Holbrook, post,* 622, it was held in an opinion by *Chief Justice Stacy* that what has been denominated a presumption of fact, when it related to the doctrine of recent possession in the law of larceny, was to be considered merely as an evidential fact or a circumstance, rather than as a presumption which would impose a burden on the defendant. In *Lee v. Pearce,* 68 N. C., 76 (85), *Chief Justice Pearson* classifies the different kinds of presumptions, particularly those arising out of certain fiduciary relations.

In *Managle v. Parker,* 75 N. H., 139 (141), referring to the presumption of revocation of a will arising from its absence at the time of death, it was said: "When it is said that a presumption of intent to revoke arises from the testator's act of destroying that copy of a will executed in duplicate which is within his reach, it is not to be inferred that a presumption *juris et de jure* is meant. The presumption referred to is not an irrebuttable conclusion of law. It is a mere inference of fact."

In Wigmore on Evidence, sec. 2491, we find it said: "The distinction between presumptions 'of law' and presumptions 'of fact' is in truth the difference between things that are in reality presumptions and things that are not presumptions at all," and that "a 'presumption of fact,' in the loose sense, is merely an improper term for the rational potency, or probative value, of the evidentiary fact." In *Mockowik v. Railroad,* 196 Mo., 550 (571), *Lamm, J.,* referred to presumptions, when understood in this sense, as "the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." In citing this case Mr. Wigmore adds: "If similes are in order, why not say that presumptions are the pitcher's 'fair balls,' which, unless the batsman hits them, become 'strikes,' and may finally put the batsman out?" 9 Wigmore, 290; *Stumpf v. Montgomery,* 101 Okl., 257.

The fact of possession of the will by the testator before his death and its unexplained absence after his death, nothing else appearing, would raise the presumption of fact that it had been destroyed by the testator with intent to revoke. *Scoggins v. Turner,* 98 N. C., 135. But as soon as the circumstances attendant upon the disappearance of the paper are made to appear, the presumption loses its potency and the issue

becomes one for the jury. The weight to be given a rebuttable presumption of fact was stated in *Gillett v. Traction Co.,* 205 Mich., 410, as follows: "It is now quite generally held by the courts that a rebuttable or *prima facie* presumption has no weight as evidence. It serves to establish a *prima facie* case, but if challenged by rebutting evidence, the presumption cannot be weighed against the evidence. Supporting evidence must be introduced, without giving any evidential force to the presumption itself." This language was quoted with approval in *Union Trust Co. v. Car Co.,* 219 Mich., 557, and again by *Brogden, J.,* in *Jeffrey v. Mfg. Co.,* 197 N. C., 724 (727), 150 S. E., 503. *S. v. Boswell,* 194 N. C., 260, 139 S. E., 374. A similar view was expressed by the Supreme Court of Massachusetts in *Clifford v. Taylor,* 204 Mass., 358 (361). See also *Christiansen v. Hilber,* 282 Mich., 403, and *Schaub v. R. R.,* 133 Mo. App., 444. 1 Elliott on Evidence, sec. 91; 1 Jones Law of Evidence in Civil Cases, secs. 9, 10 and 104 (a); 31 C. J. S., 733.

It seems clear, therefore, that whatever presumption arose from the nonproduction of the testator's copy of the will in this case it was a rebuttable one, and that it was for the jury to determine from all the evidence whether or not it had been destroyed by the testator with intent to revoke, the burden of proof being upon the propounder to establish the will and hence to show that its loss or destruction was not by his act or procurement. *In re Hedgepeth,* 150 N. C., 245, 63 S. E., 1025; *Helbig v. Ins. Co.,* 234 Ill., 251 (257); *McClellan v. Owens,* 335 Mo., 884, 95 A. L. R., 711. Any competent evidence to this effect was sufficient to carry the case to the jury.

The caveators, however, complain that the court instructed the jury to answer the issue in favor of the propounder if they found the facts to be as all the evidence tended to show. They contend the court erred in holding that the evidence was so conclusive as to compel a verdict for propounder, if all the evidence were accepted as true. An examination of the evidence set out in the case on appeal shows that the circumstances relating to the loss of the will, briefly stated, were as follows: The testator lived in Wake County on the farm on which he was born. He left surviving seven sons and daughters, several of whom lived in the county. A granddaughter lived in the home with him. The farm on which he lived was by his will devised to be divided between a son Furman Wall and a daughter Hazeline Wall Faulkner, his youngest child. Small bequests were made to his other children. The will was executed in January, 1942. It appeared that some time thereafter the testator gave to Hazeline Wall Faulkner, or her husband, $1,000 for the purchase by them of land in Vance County. The duplicate copy of his will retained by testator was placed by him in the bottom or drawer of a buffet in his kitchen where other valuable papers were kept. This

drawer was locked and he kept the key. On 20 November, 1942, he became sick, and on the 21st was taken to a hospital in Raleigh. He remained there until Sunday, 29 November, when he was brought back home, so weak he had to be lifted out of the automobile into the house, and remained in his bedroom, unable to get up without assistance or to walk. Another room separated his bedroom from the kitchen. His sons and daughters visited him. He was up and about the house a part of the time from Sunday until Wednesday. Growing worse, he was taken back to the hospital Wednesday, 2 December, and died there 3 December. One of the propounders, Hazeline Wall Faulkner, testified she saw the will on Tuesday, 24 November, after her father had been taken to the hospital. It was in the buffet drawer where he kept his papers. She testified she returned to his home Tuesday morning (1 December), about seven o'clock. "He was sitting in a chair and we helped him to bed and he never got out of bed again." After the funeral the house was locked up. Later Furman Wall, son of the decedent, accompanied by two dis- interested persons, went to the house to look for the will, and found the buffet unlocked and the will gone. After search it could not be found. The keys to the buffet were gone and were never found.

On the other hand, the caveators' evidence tended to show that in August, 1942, the testator spoke to another attorney and asked what he would charge to write a will. Later, to another witness he spoke about his will as if he contemplated making changes in the disposition of his property. To another he complained of his son Furman who was planning to move away, and of his granddaughter who because of some disagreement had temporarily left him, and said he was going to see they didn't get anything else he had. However, it appeared the son did not move away and the granddaughter returned. Another witness testified he heard the propounder Hazeline Wall Faulkner say after testator's death that he did not leave a will "because he told me he had done away with it." Caveators also introduced without objection a letter to the testator written by Mr. J. W. Bunn, dated 20 October, 1942, referring to the contemplated purchase of land for his daughter Hazeline, suggesting that "if you make such purchase it would change the status of your estate and that you would want to change your will." There was no evidence of any response to this letter. The propounder denied she had made the statement attributed to her.

Without expressing any opinion as to the facts, or the weight of the evidence, we think the trial judge was in error in giving the instruction complained of, and that the questions involved in the issue of *devisavit vel non* were for the jury to determine under appropriate instructions from the court.

New trial.