IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-272

Filed 2 April 2025

Wake County, No. 21 CVS 013401

ASHLEE INSCOE, Petitioner,

v.

TODD ISHEE, COMMISSIONER OF PRISONS, Respondent.

Appeal by respondent from writ entered 28 November 2023 by Judge A. Graham Shirley, II, in Superior Court, Wake County. Heard in the Court of Appeals 24 September 2024.

*Emancipate NC, by Elizabeth Simpson, for petitioner-appellee.*

*Attorney General Jeff Jackson, by Special Deputy Attorneys General Orlando L. Rodriguez and J. Locke Milholland, IV, for respondent-appellant.*

STROUD, Judge.

Todd Ishee, Commissioner of Prisons for North Carolina, appeals from a Writ of Mandamus ordering him to transfer Ashlee Inscoe, an inmate at Nash Correctional Institution, to a women's prison operated by the North Carolina Department of Adult Correction. Under North Carolina statutes, the North Department of Adult Correction is required to "provide quarters for female prisoners separate from those for male prisoners." N.C. Gen. Stat. § 148-44 (2023). The North Carolina Department of Adult Correction also has discretionary authority to consider an inmate's request to transfer to a different prison facility based on the inmate's claim that he or she

should be assigned to a different prison facility based on sex or gender. The North Carolina Department of Adult Correction has a multi-disciplinary committee to review requests for transfer and to decide if an inmate should be transferred. After the North Carolina Department of Adult Correction's full consideration of Petitioner's request, in accord with state and federal law, the Division Transgender Accommodation Review Committee made the decision, in its discretion, not to transfer Petitioner to another facility. Petitioner challenged the denial of her request for transfer by filing a petition for a Writ of Mandamus with the Superior Court of Wake County, claiming that the North Carolina Department of Adult Correction did not have the discretion to keep Petitioner in a male facility; her petition alleged that "[Petitioner] is a woman, and thus, she is entitled to be incarcerated at a women's prison."

The trial court ultimately granted the Writ of Mandamus requiring the North Carolina Department of Adult Correction to transfer Petitioner to a women's prison based on the fact that in 2023, Petitioner had her birth certificate amended to state her sex as "female." Although a birth certificate is *prima facie* evidence of a person's sex, it does not create an irrebuttable presumption. The trial court erred in treating the amended birth certificate as creating an irrebuttable presumption that Petitioner is female and therefore must be assigned to a female prison, particularly where the trial court found as a fact that "Petitioner is an intersex individual" who has "at least in part, masculine anatomy" and had an orchiectomy in 2022, resulting in the

amendment to the birth certificate. The trial court erred in granting the Writ of Mandamus, and therefore we reverse.

## I.     Terminology used in this Opinion

Appellate judges strive to write opinions with precision and clarity. No doubt we often fail in meeting this goal but that does not make the goal less worthy. Beyond deciding a single case, a court must consider how an opinion may be used.

> Once an opinion is filed, lawyers and others will read it with an eye to how they can use it to serve their particular purpose, no matter how remote that may be from what the writer had in mind. Thus, it is well for judicial writers to think how their words might be used, and write to forestall their misuse.

Judicial Writing Manual, 1991, FED. JUD. CTR., p. 21 https://www.fjc.gov/subject/opinion-writing-legal-writing [https://perma.cc/JGN9-C87R] (last visited Jan. 3 2025). In an effort to forestall the potential misuse of this opinion, we will first address some terminology used in this opinion.

This Court's usual practice in its opinions is to use names and terminology to refer to parties as used in the order or ruling on appeal, unless that terminology may be confusing in the particular case.[1] Based on the usual practice, in conformity with

---

[1] This Court addressed an argument based upon the trial court's terminology used to refer to a party in *Green v. Carter*, which states

> the doctrine of collateral estoppel does not apply because the trial court's use of the term "Non-parent" in place of Ms. Green's name or the word "plaintiff" in the custody order was not an adjudication of any fact or issue in that case. Court orders in child custody and child

the trial court's order, here we have generally used "Ashlee Inscoe" as Petitioner's name and "she" and "her" as pronouns for Petitioner. We also note that some documents in the record use Petitioner's former name, William M. Inscoe, and male pronouns for Petitioner. Because the trial court's order uses female pronouns for Petitioner, we will use them also. But our use of pronouns or names in this opinion, either feminine or masculine, does not indicate this Court's disapproval or approval of either type of pronoun, nor do the pronouns or name used indicate any legal ruling or holding by this Court.

## II.    Factual and Procedural Background

Todd Ishee ("Respondent"), Commissioner of Prisons for North Carolina, appeals from a Writ of Mandamus ordering him to transfer Ashlee Inscoe ("Petitioner"), an inmate at Nash Correctional Institution, to a women's prison within the purview of the North Carolina Department of Adult Correction ("the Department"). On 17 November 2021, with the consent of Respondent, the trial court entered an Order Sealing Motion and Exhibits. The Order sealed the "Motion for Writ of Mandamus and/or Preliminary Injunction, and the accompanying exhibits,

---

support cases often use descriptive terms to refer to the parties instead of technical legal terms such as "plaintiff" or "defendant." Here, the custody order used the word "Non-parent" to refer to Partner merely for convenience and clarity, just as we have used the terms "Mother" and "Partner" in this opinion.

293 N.C. App. 51, 59, 900 S.E.2d 108, 114 (2024) (citation omitted).

from public access indefinitely[.]"  Because the Motion for Writ of Mandamus and other documents filed in the trial court were sealed by court order, under North Carolina Rule of Appellate Procedure 42, the record on appeal is also sealed.  *See* N.C. R. App. P. 42(a) ("Items sealed in the trial tribunal remain under seal in the appellate courts. When these items are filed with the appellate courts, counsel must attach a copy of the order, statute, or other legal authority that sealed the item below.").

Because the parties consented to seal the trial court file to protect Petitioner's medical information, and the trial court approved sealing the court file which resulted in sealing the record on appeal as well, we recognize those reading this opinion may have difficulty understanding this case without access to the documents filed with the trial court or most of the relevant information considered by the Department, the trial court, and this Court.  As Petitioner correctly noted in her motion to seal, her "sex and gender are at issue in this matter and the information provided in her Motion is pertinent for the Court to consider."  In its brief to this Court – which was not sealed – the Department addressed "Petitioner's complex biology and medical file" and referenced facts included in the record on appeal regarding Petitioner's medical background and incidents during incarceration.  Petitioner also discusses and quotes portions of her medical records in her brief, which is not sealed.  We have a duty to address the case as the parties presented it to this Court and based on the record and trial court's findings of fact and conclusions of law.  But we appreciate our concurring colleague's concerns about discussing the facts of this case, and we have limited the

information revealed in this opinion to the small portions of the extensive record necessary to address the issues raised by the trial court's order and the briefs.

Any medical information in this opinion is not intended to re-litigate Petitioner's sex or gender, as our concurring colleague contends, but to provide the background to understand the discussion of the relevant findings and the challenged conclusions of law in the Order on appeal. For example, the trial court made unchallenged findings of fact based on the evidence presented, including medical information, but then made a conclusion of law stating in part that "the relevant statutes do not invite courts to consider the amount (sic) of chromosomes a person has, their physical characteristics, or their hormone levels, nor do the statu[t]es look to gender identity." This conclusion of law is incorrect, as discussed below, but our discussion of why this conclusion of law is in error requires some factual background.

In a case of this sort, we understand our concurring colleague's concern that this Court is addressing an intensely personal situation for Petitioner, but we are also addressing a matter of law for the guidance of the Department in conducting its operations in accord with both State and federal law for the benefit of all prisoners and all the residents of North Carolina. In deciding how much information to include in an opinion, we must consider both Petitioner's private interests and the constitutional mandate for and the public interest in open courts. *See* N.C. Const. art. I, § 18 ("All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and

justice shall be administered without favor, denial, or delay."). Instead of discussing limited information from Petitioner's case in this opinion, we could have opted to provide public transparency – which is the general rule in cases before this Court – by un-sealing some or all the record filed with this Court. Instead, we sought to balance the competing interests of Petitioner's medical privacy and this Court's obligation to provide openness under Article I, section 18 of the Constitution of North Carolina. *See, e.g., Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 463, 515 S.E.2d 675, 685 (1999) ("Thus, even though court records may generally be public records under N.C.G.S. § 132-1, a trial court may, in the proper circumstances, shield portions of court proceedings and records from the public; the power to do so is a necessary power rightfully pertaining to the judiciary as a separate branch of the government, and the General Assembly has "no power" to diminish it in any manner. N.C. Const. art. IV, § 1[.] This necessary and inherent power of the judiciary should only be exercised, however, when its use is required in the interest of the proper and fair administration of justice or where, for reasons of public policy, the openness ordinarily required of our government will be more harmful than beneficial." (citation omitted)).

For these same reasons, this Court and the Supreme Court of North Carolina routinely address appeals dealing with sensitive medical and sexual issues in this manner in other types of cases even where the court files are sealed by operation of law, such as in appeals filed under North Carolina General Statute Section 7B-1001,

North Carolina General Statute Section 7B-2602, and North Carolina General Statute Section 7A-27 "that involve a sexual offense committed against a minor." N.C. R. App. P. 42 (b). We are not convinced Petitioner's case should be treated any differently than those cases.[2] We will therefore summarize facts as relevant to Petitioner's claims and evidence as well as the Department's ruling upon Petitioner's request to the extent necessary to understand the Department's process and ruling, the trial court's proceedings and ruling, and this Court's analysis, while protecting Petitioner's medical information to the extent possible given the issues presented.

**A. Trial Court Proceedings**

The record before us tends to reflect that Petitioner began this action by filing a Petition for Writ of Mandamus on 30 September 2021, requesting Respondent to transfer her to a women's facility. Petitioner's claim was based on her allegation that she was "currently incarcerated in a men's prison . . . because she was erroneously assigned male at birth, over forty (40) years ago." Since 2020, Petitioner had been requesting the Department transfer her to a women's prison, without success. In the 2021 petition, Petitioner alleged that she "is an intersex woman" and that "'intersex' refers to a wide range of variation in physical sex characteristics, such as

---

[2] As a general rule, court files are available to the public unless sealed by court order, and documents in court files containing protected medical information or other types of information protected by law are redacted. *See, e.g., Doe v. Doe*, 263 N.C. App. 68, 92, 823 S.E.2d 583, 598 (2018) ("Adjudicating claims that carry the potential for embarrassing or injurious revelations about parties, witnesses, or a corporation's image is part of the day-to-day operations of the North Carolina courts as well." (citation and quotation marks omitted)).

chromosomes, genitals, and/or gonads, that may cause an individual's body not to conform to stereotypical notions of male or female." Petitioner alleged she was "subjected to near-constant verbal and physical harassment" by the other inmates in the facility.

Petitioner first requested transfer in 2020. In April 2020, the facility where Petitioner was housed made a formal request to the Division Transgender Accommodation Review Committee ("DTARC") to transfer Petitioner to a women's facility. The DTARC is a "multidisciplinary committee" comprised, at minimum, of the Medical Director, Chief of Psychiatry, Behavioral Health Director, Director of Rehabilitative Services, and the Prison Rape Elimination Act ("PREA") Director. *Evaluation & Management of Transgender Offenders*, E .2702(k) (2021) Standards for Adult Correctional Institutions (5th Ed.). In May 2020, the DTARC requested that Petitioner "be seen by an endocrinologist." Under the Administrative Remedy Act, Petitioner filed a grievance regarding her housing assignment on 29 July 2020. An endocrinologist examined Petitioner in September 2020 and recommended transfer, and a second doctor reviewed medical records and the endocrinologist's report and also recommended transfer.

In October 2020, the Facility Transgender Accommodation Request Committee ("FTARC") referred the request back to the DTARC. The FTARC is a facility-specific committee providing similar oversight and review as the DTARC, and comprised of representatives from the facility's psychiatry, behavioral health, nursing,

administration, unit manager, and PREA Compliance Manager, among others. *Id.* at .2702(j). Petitioner alleged that the DTARC and the Department of Public Safety denied the request to transfer Petitioner in November 2020 based upon Petitioner's "gender assigned at birth" and what she alleged were "vague 'safety concerns.'"

On 16 February 2021 and 1 April 2021, Petitioner filed two more grievances regarding her housing assignment; these were also denied. After "[c]ounsel became aware of [Petitioner's] situation" in July 2021, on 10 August 2021, Petitioner's counsel sent a letter to Respondent and his general counsel seeking Petitioner's transfer to a women's facility. After some "back-and-forth correspondence[,]" Petitioner determined that the Department "does not intend to transfer [Petitioner] to a women's facility" so she filed the Petition for Writ of Mandamus in September 2021. Petitioner alleged that Petitioner "is a woman. Therefore, there is no discretion for [Respondent] to apply as to her housing assignment."

On 8 November 2021, the Department filed a response to the Petition, admitting some allegations and denying others. As relevant to this appeal, the Department admitted "upon information and belief that, currently, Petitioner identifies as a woman" and that she was "assigned male at birth[;]" this assignment was "one factor" the Department considered when "deciding where to incarcerate Petitioner." The Department admitted it had denied Petitioner's request for transfer but alleged the request was denied for three reasons. First, the Department cited "specific, not vague, safety and security reasons." The Department alleged

"Petitioner is a convicted child sex offender having been convicted of sexually assaulting a 13-year-old girl, and therefore, is a possible safety and security threat to the population in a women's facility." Second, the Department had "determined that, in the requests for transfer to a women's facility, Petitioner has purposely misstated Petitioner's medical history" and this also posed a "possible threat to the safety and security of" other inmates in a women's facility. Third, the Department noted that "as to Petitioner's own safety and security, Petitioner has admitted numerous times that there are no threats to Petitioner in [the men's facility]" and thus "housing Petitioner at [the men's facility] is not a threat to Petitioner's safety and security."

On or about 3 August 2023, Petitioner filed a "Supplement to Motion for Writ of Mandamus[,]" noting that since she filed her original Petition in 2021, she had obtained an amended birth certificate showing her sex as female and undergone "a surgical procedure . . . that aligned her genitalia with her gender identity[.]" When she was initially assigned housing, Petitioner's birth certificate stated she was male, but on 11 May 2023 the birth certificate was amended to state she is a female. This change was made based on an affidavit from Petitioner's physician, as allowed by North Carolina General Statute Section 130A-118, after Petitioner had an orchiectomy, or removal of testicles. Since her most recent incarceration in North Carolina, she has been housed in men's prison facilities and is currently assigned to a single person cell within a housing unit that houses male offenders. Petitioner's cell opens up to a housing unit designated for men and shared by 107 male inmates.

On 10 August 2023, the trial court entered a Writ of Mandamus ordering Respondent to direct the members of the DTARC to "complete their investigation into" Petitioner's pending transfer request "and make a final determination[.]" Respondent notified the trial court that the DTARC had reviewed and denied Petitioner's transfer request on or about 6 September 2023. The DTARC issued its Report on 19 September 2023. The Report concluded Petitioner's medical, mental health, and program service needs are being met in the current facility, "however, there are safety concerns if she were transferred to her requested facility housing environment."

The trial court held a hearing on Petitioner's Motion on 21 November 2023. Following the hearing, the trial court issued a Writ of Mandamus on 28 November 2023 ordering Respondent to transfer Petitioner to a women's prison by 5 December 2023.

Respondent timely filed written Notice of Appeal on 1 December 2023. The same day, Respondent also filed a Motion for Stay of Order to Transfer Pending Appeal. The trial court granted a temporary stay on 5 December 2023. However, on 2 January 2024, the trial court entered an Order denying Respondent's Motion to Stay. Respondent then filed a Petition for Writ of Supersedeas and Motion for Temporary Stay in this Court on or about 22 December 2023. This Court entered an Order allowing Respondent's Motion for Temporary Stay on 22 December 2023. On 8 January 2024, this Court allowed Respondent's Petition for Writ of Supersedeas.

**B. The DTARC Process**

The trial court considered hundreds of pages of exhibits presented by both Petitioner and the Department. Since that information is sealed, we will briefly summarize the DTARC process and some of the evidence before the trial court. This factual background is necessary to understand the DTARC's process and decision.

When an inmate requests transfer to another facility, both state and federal law require the Department to consider the individual inmate's own unique circumstances, including his or her health and safety, as well as the safety of other inmates and the prison facility's management or security concerns. *See* 28 C.F.R. § 115.42(b), (c), (e) (discussing the "[u]se of screening information" in determining where to house inmates); *see also* N.C. Gen. Stat. § 148-36 (2023) ("Secretary of the Department of Adult Correction to control classification and operation of prison facilities."). In this case, after a full evaluation by medical experts and other specialists on the DTARC, including review of Petitioner's medical information, criminal record, and other information, it determined Petitioner should not be transferred. Specifically, the DTARC concluded that Petitioner's "gender identity history has been complicated by various and repeated unreliable, inconsistent, and at times demonstrably false reports." Medical testing, including a CT scan, and physical examination, revealed Petitioner has male anatomy. Despite Petitioner's repeated claims she had a genetic karyotype of XX, or female, she never provided any test results to confirm this claim, and she declined the Department's offers to provide

genetic testing.[3]   The DTARC also noted concerns to the safety of other inmates if Petitioner were housed in a female facility since Petitioner is a registered sex offender based upon a conviction for sexual assault on a teenage girl.   The DTARC also considered Petitioner's own safety, medical issues, and the availability of services and programs needed for her own well-being.

The DTARC's review process spanned several years and was concluded on 5 September 2023.   The DTARC considered voluminous records and reports in its evaluation of Petitioner's request for transfer.   The DTARC's Report noted that Petitioner "has been medically examined and reports indicate functioning male anatomy including a penis and testicles."   Although Petitioner "self-report[ed]" as intersex, the DTARC noted that this "[s]elf-report [is] not confirmed by Medical."   The DTARC Report included the following summary of its findings:

> [Petitioner] is registered as a sex offender related to an offense involving a teenage girl who (per official crime version) [Petitioner] took for a drive, got drunk, and sexually assaulted (victim said she woke up to [Petitioner] on top of her). [Petitioner's] own version of the crime (per OPUS) described the victim as a girlfriend and said her parents were upset and had [Petitioner] "locked up."
>
> [Petitioner's] gender identity history has been complicated by various and repeated unreliable, inconsistent, and at times demonstrably false reports. Examples include

_____

[3] Our concurring colleague states that Petitioner "produced genetic evidence indicating she is female" but our record does not include anything more than Petitioner's claims that she had testing done in California.  She also declined the Department's offer to have genetic testing done, and Petitioner alleged in her Supplement to Motion for Writ of Mandamus that a "chromosome test is now <u>irrelevant</u>" due to the amendment to her birth certificate. (Emphasis in original.)

reporting undergoing a hysterectomy, experiencing menstruation, describing her testicles as ovaries, and requesting a clitoral reduction to remove her penis. [Petitioner]'s case had been previously reviewed by the DTARC [in 2022] for requested surgeries and transfer to a female facility; these requests were not supported at that time. [Petitioner] recently had an orchiectomy due to medical complaints related to testicular pain. The surgery was approved medically, based on external consultations, but was not related to [Petitioner]'s request for gender-identity related surgeries. Although inaccurate, [Petitioner] has reported to mental health and other providers in the prison system that she is the first person to have gender-identity related surgery in a North Carolina prison.

[Petitioner]'s facility housing status was reviewed by the DTARC with input from PREA, Programs, and Operations. In review of [Petitioner]'s current facility (Nash) placement, the DTARC notes that she has been at the facility for approximately 1.5 years without any major adjustment issues (with exception to the issues created by [Petitioner]'s hoarding hormone medications as described below). According to PREA records, she has no substantiated PREA cases, but has made PREA reports in the recent past which she subsequently recanted or indicated were not accurate. Her medical, mental health, and program service needs are being met at the current facility. In this regard the DTARC review did not find issue with her current facility assignment.

In review of [Petitioner]'s requested facility placement (female prison), the DTARC notes concerns. [Petitioner] is registered as a sex offender based on the sexual assault of a female victim and moving her from a male facility to a female facility raises security concerns. [Petitioner] has suggested that moving her to a female facility would be to affirm her gender identity, however, her gender identity history has been complicated by various and repeated unreliable, inconsistent, and at times demonstrably false reports. . . . She has continued her pattern of unreliability

has been demonstrated in her recent medication hoarding behaviors as well as in relatively recent PREA reports which she recanted or indicated were not accurate.

The DTARC finds it ill-advised to consider moving [Petitioner] from her current facility where there are no demonstrated issues for her safety or the ability to meet her medical, mental health, and/or program services needs to a requested facility (female) that would create issues for the safety and security of the requested facility (female).

In its "Medical Overview" the DTARC noted concerns regarding Petitioner's misuse and hoarding of her prescribed hormone medications, behavior which posed a risk to Petitioner's own health:

[Petitioner] has repeatedly provided conflicting, inconsistent, and demonstrably false fabricated reports of remote and recent medical history, has repeatedly provided erroneous symptomatology and manifestations of illness not only during her medical care, but has used those erroneous reports outside of her medical care as well. Most recently, [Petitioner] reported that DAC had failed to refill hormone replacement medications. Not only was this entirely untrue, but a routine inspection of [Petitioner]'s room uncovered 450 tablets of estradiol and 68 tablets of spironolactone. As prescribed, this is more than 225 days of medication which was not taken as prescribed. Most concerning is that labs (blood) obtained after this discovery revealed very dangerously high estradiol levels (853). For reference, the highest level of estradiol in a biologic female is 360. Of note, this was an acute development, as recent lab work demonstrated normal estradiol levels. The only explanation for this was that [Petitioner] must have consumed what would be considered a potentially toxic dose of the medication. [Petitioner]'s supratherapeutic level demonstrates not only severe non-compliance but impacts many other aspects of medical treatments, and most concerning, poses a significant risk to [Petitioner]'s health. These repeated and concerning manipulations,

coupled with PREA accusations which were subsequently recanted, create serious question about the credibility of [Petitioner]'s self-report to medical providers and medical decisions made in such circumstances must be carefully weighed in order to not initiate treatments which could harm the patient.

Based on all these considerations, the DTARC stated that:

> The DTARC does not support the request for gender-identity related facility transfer. Her request for transfer to a female facility was reviewed by the DTARC with input from PREA, Programs, and Operations. A review of the security staff ability to house and supervise [Petitioner] to ensure [Petitioner]'s safety and the safety of the population in her current facility assignment appears acceptable, however, there are safety concerns if she were transferred to her requested facility housing environment. Medical, mental health, and program services are available to meet the needs of [Petitioner] at her current facility assignment.

## III. Analysis

"The writ of mandamus is an order from a court of competent jurisdiction to a board, corporation, inferior court, officer or person commanding the performance of a specified official duty imposed by law." *Sutton v. Figgatt*, 280 N.C. 89, 93, 185 S.E.2d 97, 99 (1971) (citations omitted). It is "a limited and extraordinary remedy to provide a swift enforcement of a party's already established legal rights." *Holroyd v. Montgomery Cnty.*, 167 N.C. App. 539, 543, 606 S.E.2d 353, 356 (2004). "The party seeking such writ must have a clear legal right to demand it, and the tribunal, board, corporation, or person must be under a present, clear, legal duty to perform the act sought to be enforced." *Bd. of Managers of James Walker Mem'l Hosp. of Wilmington*

*v. City of Wilmington*, 235 N.C. 597, 600, 70 S.E.2d 833, 836 (1952) (citations omitted). We review grants of mandamus *de novo*. *See Graham Cnty. Bd. of Elections v. Graham Cnty. Bd. of Comm'rs*, 212 N.C. 313, 322, 712 S.E.2d 372, 379 (2011). We also consider issues of statutory construction *de novo*. *See N.C. Farm Bureau Mut. Ins. Co., Inc. v. Hebert*, 385 N.C. 705, 711, 898 S.E.2d 718, 724 (2024) ("Questions of statutory construction are . . . reviewed de novo." (citation omitted)). Finally, "[q]uestions of law are reviewed de novo[.]" *Cherry Cmty. Org. v. Sellars*, 381 N.C. 239, 247, 871 S.E.2d 706, 714 (2022) (citation omitted).

In its Writ of Mandamus, the trial court made findings of fact and conclusions of law. The Department does not challenge the trial court's findings of fact on appeal, so those are binding on this court. *See id.* ("A trial court's unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal."). We will note some findings as relevant to the issues on appeal. The Department raises arguments about some of the trial court's conclusions of law. The trial court first concluded that the Department has "discretionary authority relating to the actions of [the] FTARC and [the] DTARC and their decisions made under PREA[,] 34 U.S.C.S. § 30301-09; 28 C.F.R. Part. 115[,]" and that the Department committed "no abuse of discretion . . . as it relates to [the] FTARC, [the] DTARC, or discretionary decisions made under PREA." Therefore, the trial court concluded the Department had conducted its review of Petitioner's request for transfer in compliance with federal and state law and it did not abuse its discretion. But the

trial court then concluded the Department did *not* have discretion in regard to

Petitioner's request for transfer and issued the Writ of Mandamus on this basis.

The Department challenges the trial court's issuance of the Writ of Mandamus

based on North Carolina General Statute Sections 148-44 and 130A-93. The

Department contends that the trial court erred in its interpretation of these statutes.

After making conclusions of law about the Department's proper review of Petitioner's

request under state and federal law, the trial court's next conclusion of law addressed

North Carolina General Statute Section 148-44:

> 4. However, N.C. Gen. Stat. § 148-44 is a sex-based,
> mandatory requirement on the Secretary of the
> Department of Corrections to maintain separate living and
> working facilities (or "quarters") for men and women.

The Department does not challenge conclusion of law 4.

The Department's arguments on appeal address the remaining conclusions of

law:

> 5. Further, Petitioner's birth certificate is *prima facie*
> evidence that Petitioner is of the female sex under N.C.
> Gen. Stat. § 130A-93.
>
> 6. Respondent has failed to present evidence that
> challenges the authenticity of the birth certificate. They
> also do not dispute that an orchiectomy was performed,
> such orchiectomy being the basis for the amended birth
> certificate.
>
> 7. In making the determination of Petitioner's sex, the
> [c]ourt notes that the relevant statutes do not invite courts
> to consider the amount (sic) of chromosomes a person has,
> their physical characteristics, or their hormone levels, nor

do the statu[t]es look to gender identity. The statutes solely look to a person's sex. Through her birth certificate, Petitioner has presented *prima facie* evidence that her sex is female.

8. In securing her amended birth certificate, Petitioner met the North Carolina requirements of N.C. Gen. Stat. § 130A-118 with a notarized letter from a doctor confirming certain statutory requirements. That is all she has to do in order to modify her sex. There is no dispute between the parties as to whether Petitioner has met these requirements. To pursue further lines of inquiry and to rule against the *prima facie* evidence that Petitioner has presented, on the current record, would put this [c]ourt in the position of a legislature. This [c]ourt declines to take such a position. Accordingly, this [c]ourt concludes that Petitioner's sex is female under N.C. Gen. Stat. § 148-44.[4]

We review the trial court's conclusions of law *de novo*. *See In re Bass*, 366 N.C. 464, 467, 738 S.E.2d 173, 175 (2013) (citation and quotation marks omitted). The trial court concluded, "§ 148-44 is a sex-based, mandatory requirement on the Secretary of the Department of Corrections to maintain separate living and working facilities (or "quarters") for men and women." However, the Department's decision of where to house a particular inmate is inherently discretionary based on federal and state law. Our statutes grant the Department discretionary authority to determine

---

[4] Our concurring colleague believes that this "conclusion is clearly beyond the scope of this appeal." We note that the Department argued in its brief on appeal that the trial court erred in *this* conclusion of law by treating Petitioner's birth certificate stating she is female as *prima facie* evidence of her sex and that the birth certificate alone dictates her assignment to a female facility under North Carolina General Statute Section 148-44. This question was raised by the Department's brief on appeal and we have therefore addressed it. The Department argued that "the trial court's interpretation of N.C.G.S. §§ 148-44 and 130A-93 divested the Department of its discretion to make housing determinations." (Capitalization altered.) The Department argued at length about the trial court's erroneous interpretation of the interaction of North Carolina General Statute Section 130A-93 and 148-44.

the appropriate facility in which to house each individual:

> Subject to such rules and regulations, the Secretary shall classify the facilities of the State prison system and develop a variety of programs so as to permit proper segregation and treatment of prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and correctional treatment of persons committed to the Division. The Secretary of the Adult Correction, or his authorized representative, shall designate the places of confinement where sentences to imprisonment in the State's prison system shall be served. *The Secretary or his representative may designate any available facility appropriate for the individual in view of custodial and correctional considerations.*

N.C. Gen. Stat. § 148-36 (emphasis added). Thus, our statutes expressly accord the Department with discretion to determine the appropriate facility based on "custodial and correctional considerations." *Id.* Petitioner contends, however, that based on the statutory mandate the Department provide separate "quarters" for male and female prisoners, the Department's discretion is limited to determining the particular facility but not the *type* of facility (i.e., male or female prison) to which an inmate may be assigned.

North Carolina General Statute Section 148-44 provides: "The Department shall provide quarters for female prisoners separate from those for male prisoners." N.C. Gen. Stat. § 148-44. Petitioner contends Section 148-36 is subordinate to Section 148-44, requiring the Department to house male and female inmates separately because Section 148-36 does not reference sex. Thus, Petitioner argues, the

Department's decision on Petitioner's transfer request was not, in fact, discretionary. Therefore, in Petitioner's view, the Writ of Mandamus did not remove discretion from the Department at all because its decision was not discretionary. This interpretation misconstrues the statutes and, indeed, strips the Department of the discretion granted to it.

The grant of discretion to the Department under Section 148-36 is broad, requiring only that the Department make a decision based on "custodial and correctional considerations." N.C. Gen. Stat. § 148-36. Taken together with the requirement to provide separate quarters for male and female inmates under Section 148-44, *see* N.C. Gen. Stat. § 148-44, the Department may assign an inmate to any prison facility so long as male and female inmates are quartered separately.

Also, federal regulations accompanying PREA affirm state agencies' discretionary authority in housing determinations. PREA is a federal law enacted to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30302. Although PREA is a federal law, its terms reflect that it also applies to State prisons.[5] In the

---

[5] For example, in its subsection providing definitions, PREA defines "prison" as "any confinement facility of a Federal, State, or local government, whether administered by such government or by a private organization on behalf of such government, and includes (A) any local jail or police lockup; and (B) any juvenile facility used for the custody or care of juvenile inmates." 34 U.S.C. § 30309(7). Federal regulations accompanying PREA employ a nearly identical definition, which likewise encompasses state facilities: "Prison means an institution under Federal or State jurisdiction whose primary use is for the confinement of individuals convicted of a serious crime[.]" 28 C.F.R. § 115.5.

accompanying regulations in the subsection entitled "Screening for Risk of Sexual

Victimization and Abusiveness[,]" federal regulations expressly address housing

assignments for transgender and intersex inmates:

> (b) The agency[6] shall make individualized determinations
> about how to ensure the safety of each inmate.
>
> (c) In deciding whether to assign a transgender or intersex
> inmate to a facility for male or female inmates, and in
> making other housing and programming assignments, *the
> agency shall consider on a case-by-case basis* whether a
> placement would ensure the inmate's health and safety,
> and whether the placement would present management or
> security problems.
>
> . . . .
>
> (e) A transgender or intersex inmate's own views with
> respect to his or her own safety shall be given *serious
> consideration*.

28 C.F.R. § 115.42(b), (c), (e) (emphasis added). This language illustrates that federal

law contemplates multi-factor, discretionary decisions. Indeed, as these regulations

underscore, such individualized considerations are necessary to uphold each inmate's

safety, as well as each facility's management and security. *See* 28 C.F.R. § 115.42(a),

(c).

Here, in issuing its second Writ of Mandamus, the trial court expressly first

concluded the Department had not abused its discretion in making a housing decision

---

6 Under PREA, "[a]gency means the unit of a State, local, corporate, or nonprofit authority, or of the Department of Justice, with direct responsibility for the operation of any facility that confines inmates, detainees, or residents[.]" 28 C.F.R. § 115.5.

under PREA arising from the FTARC and the DTARC reviews. However, in this second Writ of Mandamus, the trial court also ordered "Petitioner is to be transferred to a women's prison within the purview of the North Carolina Department of Adult Correction." Given the discretionary nature of the Department's housing decisions, this command moves from compelling an official to make a discretionary decision to "requir[ing] a particular result" – an impermissible use of mandamus. *In re T.H.T.*, 362 N.C. 446, 454, 665 S.E.2d 54, 59 (2008) (citation omitted); *see also Hamlet Hosp. & Training Sch. for Nurses v. Joint Comm. On Standardization et al.*, 234 N.C. 673, 680, 68 S.E.2d 862, 868 (1952) ("In such cases mandamus lies only to compel public officials to take action, but ordinarily it will not require them, in matters involving the exercise of discretion, to act in any particular way."). "It is well settled law that Mandamus cannot be invoked to control the exercise of discretion of a board, officer, or court . . . unless it clearly appears that there has been an abuse of discretion." *Moody v. Transylvania Cnty.*, 271 N.C. 384, 390, 156 S.E.2d 716, 720 (1967) (citation and quotation marks omitted). In this case, however, the trial court expressly concluded "[t]here was no abuse of discretion by Respondent as it relates to [the] FTARC, [the] DTARC, or discretionary decisions made under PREA." The trial court's grant of mandamus infringed on the Department's discretionary authority.[7]

---

[7] Indeed, the two Writs of Mandamus entered in this case illustrate the issue. In its first Writ of Mandamus entered 10 August 2023, the trial court ordered Respondent to compel the DTARC to make a final determination on Petitioner's transfer request—a type of action clearly approved of by our

The trial court's erroneous conclusion that the Department had no discretion to assign Petitioner to a male prison facility was based directly on its legal error in considering Petitioner's birth certificate as creating an irrebuttable presumption she must be classified as female. Our concurring colleague states that there was no reason for this Court to discuss the facts of this case because "Petitioner's sex is irrefutably unnecessary to the analysis." But we must address the arguments about the trial court's conclusions of law properly presented by the parties in their briefs. According to Petitioner, her "gender identity" is necessary to our analysis. She argues that her "gender identity, her lived experience, her medical records, and a number of other markers including, but not limited to, her official amended birth certificate, reflect the indisputable (*and undisputed*) fact that [Petitioner] is a woman." (Emphasis in original.) Petitioner argues that her sex is the only fact necessary to the analysis, and her amended birth certificate requires a legal conclusion that she is female and must be assigned to a female facility. She contends that

> N.C. Gen. Stat. § 130A-93(h) is clear in its mandate that a vital record such as [Petitioner's] amended birth certificate is *prima facie* evidence of [Petitioner's] sex. The Department's denial that [Petitioner] is a female prisoner ignores [Petitioner's] material reality, and destroys the meaning of Sections 130A-118(b)(4) and 130A-93(h) which,

caselaw. *See Bd. of Educ. of Yancey Cnty. v. Bd. of Comm'rs of Yancey Cnty.*, 189 N.C. 650, 652, 127 S.E. 692, 693 (1925) ("The interested citizen is entitled to compel the exercise of discretion by public officers, in such as the instant case; but he cannot direct its course."); *Midgette v. Pate*, 94 N.C. App. 498, 504, 380 S.E.2d 572, 576 (1989) ("Where a duty to make a decision is imposed upon a body or officer, even though discretion is involved in the determination, mandamus will lie to compel the body or officer to make the decision, since there is no discretion involved in whether action is to be taken." (citation omitted)).

> unlike the Department, do have the authority to determine an individual's sex. The statutes regarding vital records and sex apply to all North Carolina residents, regardless of prisoner or intersex status. If the Department is allowed the statutorily-unfounded "discretion" to deny [Petitioner's] sex, simply because it does not agree with the State Registrar, then the Department would be given the power to invalidate the sex of any prisoner in North Carolina.

In response, the Department argues the trial court's conclusion of law interpreting this statute – which adopted Petitioner's contention regarding the legal effect of her birth certificate – is in error. The Department contends that "[a]bsent reversal, § 130A-93—a statute about public health and vital statistics, not prisons—would suddenly dictate the placement determinations of the Department and completely eliminate the Department's discretion to make certain housing determinations as provided by state and federal law."

The trial court's conclusions of law 6, 7 and 8 were based upon an erroneous interpretation of North Carolina General Statute Section 130A-93. The trial court stated correctly that a birth certificate is "prima facie evidence" of Petitioner's sex. *See* N.C. Gen. Stat. § 130A-93(h) ("A certified copy issued under the provisions of this section shall have the same evidentiary value as the original and shall be prima facie evidence of the facts stated in the document."). But *prima facie* evidence creates only a rebuttable presumption. Petitioner's birth certificate was amended in May 2023, before the DTARC concluded its review in September 2023, but the DTARC also considered voluminous other evidence in making its decision, as we briefly

summarized above. But the existence of evidence opposing the *prima facie* presumption created by the birth certificate can overcome the rebuttable presumption. The trial court's conclusions to the contrary, as stated in conclusions of law 7 and 8, are in error.

Our Supreme Court has described a rebuttable presumption as "a mere inference of fact" which "loses its potency" upon the presentation of opposing evidence:

> It is now quite generally held by the courts that a rebuttable or prima facie presumption has no weight as evidence. It serves to establish a prima facie case; but*, if challenged by rebutting evidence, the presumption cannot be weighed against the evidence. Supporting evidence must be introduced, and it then becomes a question of weighing the actual evidence introduced, without giving any evidential force to the presumption itself.*

*In re Wall's Will*, 223 N.C. 591, 595-96, 27 S.E.2d 728, 731 (1943) (emphasis added) (citation and quotation marks omitted). The Supreme Court has distinguished between the presumption created by "prima facie" evidence and an irrebuttable conclusion of law:

> A rebuttable presumption is not an irrebuttable conclusion of law. It is a mere inference of fact. A rebuttable presumption has no weight as evidence. It serves to establish a *prima facie* case, but *if challenged by rebutting evidence, the presumption cannot be weighed against the evidence.* Supporting evidence must be introduced, without giving any evidential weight to the presumption itself.

*In re L.D.B.*, 168 N.C. 206, 211, 617 S.E.2d 288, 291 (2005) (emphasis in original)

(citation omitted).

Here, Petitioner's argument and the trial court's Writ of Mandamus, in conclusions of law 6, 7, and 8, treat the amended birth certificate as creating an irrebuttable conclusion of law. The argument, and the trial court's ruling, can be expressed as a simple, but erroneous, logical syllogism:

*Major premise*: The Department must "provide quarters for female prisoners separate from those for male prisoners." N.C. Gen. Stat. § 148-44.

*Minor premise*: Petitioner's amended birth certificate is *prima facie* evidence that she is female.[8]

*Conclusion*: Therefore, the Department must house Petitioner in a female facility.

The legal error begins in the minor premise and leads to the erroneous

---

[8] The trial court's error in treating the birth certificate as requiring a conclusion of law that "Petitioner's sex is female" is illustrated in the conclusion quoted by our concurring colleague. We also note that the Department argued,

> even assuming that § 130A-93 has *some* relevance in the prison context, that statute says only that an individual's birth certificate is "prima facie evidence of the facts stated in the document." N.C.G.S. § 130A-93(h). In deciding where to house Petitioner, state law tasks the Department with considering a far broader range of factors than simply whether Petitioner's birth certificate is accurate. Most notably, the Department needed to consider how it could best ensure Petitioner's safety and the safety of the other offenders in its custody. Particularly given Petitioner's complex biology and medical file, the Department could not responsibly let a birth certificate blindly dictate Petitioner's placement. Section 130A-93 does not require otherwise. (Emphasis in Original.)

conclusion. As noted above, we review the trial court's conclusions of law *de novo*.[9] *See In re Bass*, 366 N.C. at 467, 738 S.E.2d at 175; *see also Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004) ("Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." (citation omitted)). Petitioner's amended birth certificate *is prima facie* evidence that she is female, "but, if challenged by rebutting evidence, the presumption cannot be weighed against the evidence." *In re Wall's Will*, 223 N.C. at 596, 27 S.E.2d at 731. The Department presented voluminous evidence that Petitioner is male or at least intersex. Petitioner presented no evidence that she is actually female; she claims to be intersex. The medical evidence showed she had full male anatomy, at least until the orchiectomy, when the testicles were surgically removed. Petitioner's evidence tended to show she was "intersex" which is not the same as female. Petitioner's birth certificate does not require a finding or a legal conclusion she is female or that she must be housed in a female prison facility. In fact, the trial court found, in one of the *unchallenged* findings of fact, that "Petitioner is an intersex individual[.]"[10] Although much of the evidence considered by the

---

[9] Our concurring colleague asserts that we were not "asked" to "rebut the presumption" created by Petitioner's birth certificate. But we were asked to review the trial court's conclusions of law, and we review conclusions of law *de novo*. Here, the trial court's conclusion of law was in error, based on both the law as to the effect of *prima facie* evidence and the unchallenged findings of fact.

[10] In her brief to this Court, Petitioner repeatedly insists that she is both female and intersex. She argues that "Petitioner[ ] is a female prisoner who is wrongfully incarcerated inside a men's prison in North Carolina, in violation of a mandatory centuries-old statute that instructs: 'The Department shall provide quarters for female prisoners separate from those for male prisoners.' N.C. Gen. Stat. § 148-

DTARC challenges the Petitioner's claim of being "intersex," this finding is unchallenged and we accept it as true for purposes of appellate review. *See Graham Cnty. Bd. of Elections*, 212 N.C. at 322, 712 S.E.2d at 379. Under the regulations of the Department, "intersex" is defined as "[a] person who has a sexual or reproductive anatomy or chromosomal pattern that does not seem to fit typical definitions of male or female. Intersex medical conditions are sometimes referred to as disorders of sex development. An example would be an individual born with characteristics of both sexes." *Offender Sexual Abuse and Sexual Harassment Policy*, F .3400(m) (2022). Put more simply, an intersex person is physiologically neither clearly male *nor* clearly female. This Court has previously noted the definitions of "male" and "female"[11]:

> A "female" is defined as an "individual that bears young or produces eggs as distinguished from one that begets young." Webster's New Collegiate Dictionary 422 (8th ed. 1977); *see also* Oxford English Dictionary 823 (2nd ed. 1989) (defining female as "belonging to the sex which bears offspring"). A "male" is defined as "of, relating to, or being the sex that begets young by performing the fertilizing function in generation and produces relatively small usually motile gametes (as sperms, spermatozoids, or spermatozoa) by which the eggs of a female are made fertile." Webster's New Collegiate Dictionary 695 (8th ed. 1977); *see also* Oxford English Dictionary 259 (2nd ed. 1989) ("Of or belonging to the sex which begets offspring, or performs the fecundating or fertilizing function of

---

44." In the next paragraph, she quotes finding of fact 7: "[Petitioner] is an intersex individual and under Prison Rape Elimination Act (PREA) standards, she is at a high risk of being an abuse victim."
[11] The North Carolina General Assembly has not adopted a statutory definition of male, female, or "biological sex" applicable to this case. However, we note that the definitions as used in this opinion are generally consistent with the definitions as stated in Chapter 90, Article 1N, entitled "Gender Transition Procedures on Minors." *See* N.C. Gen. Stat. Ch. 90, art. 1N (2023). These definitions were effective as of 1 August 2023, before the trial court's issuance of the Writ.

generation.").

*Green v. Carter*, 293 N.C. App. 51, 62, 900 S.E.2d 108, 116 (2024) (brackets omitted).

Based on the trial court's *unchallenged* findings of fact, Petitioner is neither male nor female; she is intersex. The trial court found that "Petitioner developed, at least in part, masculine anatomy and was raised as a boy. . . . Both parties agree that Petitioner underwent an orchiectomy on September 7, 2022." An orchiectomy is the "surgical removal of one or both testes." Merriam-Webster's New Collegiate Dictionary 873 (11th ed. 2005). An amended birth certificate, obtained in May 2023 – about three years *after* Petitioner first requested transfer to another facility – does not change the physical fact that Petitioner is intersex. The trial court treated the birth certificate as creating an irrebuttable presumption that Petitioner is female, despite its finding of fact that she is intersex, and therefore made an error of law in concluding that Petitioner is female. This conclusion of law was based on an erroneous interpretation of North Carolina General Statute Section 130A-93 since *prima facie* evidence does not preclude the trial court from considering evidence opposing the rebuttable presumption, such as evidence presented in this case about "chromosomes a person has, their physical characteristics, or their hormone levels." Evidence of this type can be considered, and should be considered if presented, in opposition to the *prima facie* evidence of the birth certificate.

The trial court's unchallenged finding that Petitioner is "intersex" does not eliminate the Department's discretion to determine an appropriate housing

assignment. In considering Petitioner's request for transfer, the Department was required to exercise its discretion to deal with actual physical realities of both Petitioner and other inmates, and its discretion is not limited by Petitioner's personal "material reality," as she describes it, or her "gender identity." To protect all inmates in North Carolina's prison facilities, the Department must operate its prisons based on real custodial and correctional considerations, including the characteristics and needs of each prisoner as well as the available prison facilities and programs and the protection of all prisoners. Thus, the trial court's error of law in the application of North Carolina General Statute Section 130A-93 in conjunction with North Carolina General Statute Section 148-44 caused the trial court to issue the Writ of Mandamus in error. This error infringed on the Department's discretionary authority to determine the appropriate housing assignment by ordering the Department to assign an inmate to a particular facility or type of facility. Mandamus was not the proper remedy in this case.[12] Consequently, the trial court's issuance of the second Writ of

---

[12] Additionally, we note Petitioner had an alternative legal remedy available to her. Our statutes, in the section immediately following the mandate for the Division of Prisons to adopt an Administrative Remedy Procedure, provide:

> (a) Upon approval of the Administrative Remedy Procedure . . . , and the implementation of the procedure, this procedure shall constitute the administrative remedies available to a prisoner for the purpose of *preserving any cause of action under the purview of the Administrative Remedy Procedure*, which a prisoner may claim to have against the State of North Carolina, the Division of Prisons of the Department of Adult Correction, or its employees.

> (b) No State court shall entertain a prisoner's grievance or

Mandamus was in error.

## IV.    Conclusion

Accordingly, for the foregoing reasons, we reverse the trial court's 28 November

2023 Writ of Mandamus.

REVERSED.

Judge ZACHARY concurs.

Judge HAMPSON concurs in a separate opinion.

---

complaint which falls under the purview of the Administrative Remedy Procedure *unless and until* the prisoner shall have exhausted the remedies as provided in said procedure.  If the prisoner has failed to pursue administrative remedies through this procedure, any petition or complaint he files shall be stayed for 90 days to allow the prisoner to file a grievance and for completion of the procedure.  If at the end of 90 days the prisoner has failed to timely file his grievance, then the *petition or complaint* shall be dismissed.  Provided, however, that the court can waive the exhaustion requirement if it finds such waiver to be in the interest of justice.

N.C. Gen. Stat. § 148-118.2 (2023) (emphasis added).

Thus, our statutes clearly contemplate that an inmate dissatisfied with the outcome of the grievance process may file a petition or complaint in a state court for judicial review.  *Cf. Evans v. Ishee*, 2023 WL 3671821 (W.D.N.C.) (declining to exercise supplemental jurisdiction over an inmate's claim brought pursuant to N.C. Gen. Stat. § 148-118.2(b) where no federal claims were viable).  Indeed, the North Carolina Industrial Commission has reviewed a case in which an inmate filed a claim pursuant to the State Tort Claims Act, *Alston v. N.C. Dep't of Pub. Safety*, 2017 WL 6949233, I.C. No. TA-24795 (N.C. Ind. Com.), and declined to hear another State Tort Claims Act claim because the inmate had not exhausted his administrative remedies, *Taylor v. N.C. Dep't of Corr.*, 2010 WL 519701, I.C. No. TA-19535 (N.C. Ind. Com.) (citing N.C. Gen. Stat. § 148-118.2).  Thus, Petitioner could have filed a complaint in superior court for judicial review of her prior grievances.  Therefore, mandamus is not a proper remedy.  *See TAC Stafford, LLC v. Town of Mooresville*, 282 N.C. App. 686, 698, 872 S.E.2d 95, 104 (2022) ("The trial court may only issue a writ of mandamus in the absence of an alternative, legally adequate remedy." (citation and quotation marks omitted)).

HAMPSON, Judge, concurring.

I agree that the Writ of Mandamus was not the proper remedy in this case. This is so because the issuance of the Writ erroneously infringed on the Department's discretionary authority to determine the appropriate housing assignment by ordering the Department to assign an inmate to a particular facility or type of facility. That determination resolves the narrow issue before us.

The majority, however, goes well beyond this narrow issue. Instead, the majority elects to expose Petitioner's identity, medical records, and other materials in order to relitigate Petitioner's sex and gender identity. Not only is this unnecessary, it is misguided. As such, I cannot join the majority's opinion.

As the majority recognizes, its words matter. Indeed, in feeling the need to disclaim its use of female pronouns and Petitioner's name, the majority speaks volumes. The use of female pronouns and name is not at issue. No party disputes the use of these pronouns. Respondent's briefing consistently uses she/her pronouns for Petitioner. The majority's disclaimer purporting not to rule on Petitioner's gender identity only serves to preview its ruling rejecting Petitioner's gender identity.

The majority then makes the unfortunate choice to reveal the contents of Petitioner's medical records, DTARC report, and other personal and private information in great detail. This material was filed under seal—precisely to protect this information from public disclosure. This personal and sensitive information is entirely irrelevant to the issue of whether mandamus is an appropriate remedy in

this case. Its only purpose in the majority opinion is to, again, attempt to undermine Petitioner's gender identity.[13]

Finally, after having expressly concluded the trial court's grant of mandamus infringed on the Department's discretionary authority, the majority takes direct aim at Petitioner's gender identity. In so doing, the majority ignores the trial court's unchallenged Findings and instead substitutes its own judgment on the matter. Although the trial court did find "Petitioner is an intersex individual," it also found: Petitioner's birth certificate lists her sex as female and was amended pursuant to N.C. Gen. Stat. § 130A-118(b)(4); Petitioner produced genetic evidence indicating she is female; and, both parties agree Petitioner's gender identity is female and she has undergone gender affirming care consistent with her gender identity since at least 2019. The trial court then made the following unchallenged Conclusion of Law:

> In securing her amended birth certificate, Petitioner met the North Carolina requirements of N.C. Gen. Stat. § 130A-118 with a notarized letter from a doctor confirming certain statutory requirements. That is all she has to do in order to modify her sex. There is no dispute between the parties as to whether Petitioner has met these requirements. To pursue further lines of inquiry and to rule against the *prima facie* evidence that Petitioner has

---

[13] The majority states our Courts "routinely address appeals dealing with sensitive medical and sexual issues in this manner in other types of cases even where the files are sealed by operation of law[.]" That is so where those sealed items are material to the case at hand. Here, however, they are not. Based on the Department's arguments, an individual assigned female at birth could be in the same position as Petitioner (although a transfer request would not be considered by DTARC or FTARC). That being the case, it cannot be true that Petitioner's biological or other medical history is relevant to our analysis. Further, how DTARC arrived at its decision is clearly in no way material to whether the trial court had the authority to order Petitioner's transfer via Writ of Mandamus. Thus, I see no compelling reason to include so much of Petitioner's private, sealed information in the majority opinion.

> presented, on the current record, would put this Court in the position of a legislature. This Court declines to take such a position. Accordingly, this Court concludes Petitioner's sex is female under N.C. Gen. Stat. § 148-44.

The majority does not address this Conclusion. And, importantly, this Conclusion is clearly beyond the scope of this appeal. N.C.R. App. P. 28 (2024); *State v. Barfield*, 127 N.C. App. 399, 401, 489 S.E.2d 905, 907 (1997) ("Appellate review is confined to those exceptions which pertain to the argument presented."). Fundamentally, it is error to address issues not properly before us. *See Matter of R.A.F.*, 384 N.C. 505, 512, 886 S.E.2d 159, 164 (2023) ("[T]he Court of Appeals *may not address* an issue not raised or argued by [a party][.]" (emphasis added)).

Further, while the majority and I agree Petitioner's birth certificate constitutes prima facie evidence of her sex, the majority—unasked—improperly attempts to itself unilaterally rebut the presumption Petitioner's birth certificate creates. Petitioner's sex is irrefutably unnecessary to the analysis. The broad question presented by this case is whether a trial court may compel, by writ of mandamus, the Department to transfer Petitioner from one prison facility to another, following an administrative review by the Department and its decision not to transfer Petitioner. Drilling down, we must determine whether the assignment of an inmate to a particular facility is a discretionary decision. Those questions are unchanged by the sex or gender of the inmate involved. Had the majority's analysis stopped before its discussion attacking the rebuttable presumption created by the birth certificate, the result would be the

same and the opinion would have fully addressed the dispositive issue on appeal. Thus, the majority's exposition on Petitioner's sex and gender identity is clearly dicta. *See Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) ("Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby." (citations omitted)).[14]

In sum, I believe the majority far exceeds the task before us. It is enough to say that after conducting an in-depth investigation and review, the Department made a discretionary determination on the facts before it not to transfer Petitioner—an intersex person—to a women's prison. The grant of discretion to the Department under Section 148-36 is broad, requiring only that the Department make a decision based on "custodial and correctional considerations." N.C. Gen. Stat. §148-36 (2023). Taken together with the requirement to provide separate quarters for male and female inmates under Section 148-44, the Department may assign an inmate to any prison facility so long as male and female inmates are quartered separately. On the Record before us, there is no indication the Department abused its discretion in making its individualized determination in this case. The trial court expressly found

---

[14] The majority takes issue with this characterization, stating that it addressed this matter because "[t]his question was clearly raised by the Department's brief on appeal[.]" However, the Department also raised issues regarding the trial court's interpretation of Section 148-44; that Section's requirement of "separate quarters" for male and female inmates and the interpretation of the term "quarters"; and Petitioner's right to placement in a particular facility. Yet the majority declines to address those arguments in the same manner. I think this appropriate because those issues are separate from the dispositive issue in this case: whether the trial court could order Petitioner's transfer using a writ of mandamus.

*HAMPSON, J., concurring.*

the Department had not abused its discretion under the PREA in its FTARC and DTARC review processes—which included individualized consideration of Petitioner's circumstances and safety, each facility's management and security, and the safety of other inmates. The trial court's issuance of the Writ of Mandamus to compel transfer was, thus, error. This is so because it improperly infringed on the Department's discretionary authority and, instead, compelled a particular result. While, as the majority correctly notes, Petitioner may have other remedies available to her, mandamus is not the proper vehicle in this case.